

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-18-1995

# United States v Edmonds

Precedential or Non-Precedential:

Docket 93-1890

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"United States v Edmonds" (1995). *1995 Decisions.* Paper 103.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/103

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NOS. 93-1890, 93-1914, 93-1920, 93-1947


UNITED STATES OF AMERICA

v.

THEODORE EDMONDS,
Appellant in No. 93-1890


UNITED STATES OF AMERICA

v.

LORENZO DUNCAN, a/k/a TARIQ
Lorenzo Duncan,
Appellant in No. 93-1914


UNITED STATES OF AMERICA

v.

CARLTON LOVE,
Appellant in No. 93-1920


UNITED STATES OF AMERICA

v.

CORA LOVE,
Appellant in No. 93-1947


On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Crim. Action Nos. 92-cr-00504-1, 92-cr-00504-6,
92-cr-00504-5, 92-cr-00504-16)


Argued October 24, 1994

BEFORE:   STAPLETON, HUTCHINSON and GARTH, <u>Circuit Judges</u>

(Opinion Filed  April 18, l995 )




                        Michael R. Stiles
                        U.S. Attorney
                        Walter S. Batty, Jr.
                        Assistant U.S. Attorney
                        Valli F. Baldassano
                        Assistant U.S. Attorney
                        Jeffery W. Whitt (Argued)
                        Assistant U.S. Attorney
                        James Swain
                        Assistant U.S. Attorney
                        615 Chestnut Street
                        Suite 1250
                        Philadelphia, PA 19106

                            Attorneys for Appellee

                        Dominick J. Sorise (Argued)
                        33830 Harper
                        Clinton Township, MI  48035

                            Attorney for Theodore Edmonds
                            Appellant in No. 93-1890

                        Thomas Colas Carroll (Argued)
                        Carroll & Cedrone
                        Suite 750 The Curtis Center
                        Independence Square West
                        Philadelphia, PA  19106

                            Attorney for Lorenzo Duncan
                            Appellant in No. 93-1914

                        Anthony T. Chambers (Argued)
                        3650 Penobscot Building
                        Detroit, MI  48226

                            Attorney for Carlton Love
                            Appellant in No. 93-1920

John Royal (Argued)
One Kennedy Square, Suite 1930
Detroit, MI  48226
        and
Cornelius Pitts
3650 Penobscot Building
Detroit, MI  48226

        Attorneys for Cora Love
        Appellant in No. 93-1947

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Theodore Edmonds, Lorenzo Duncan, Carlton Love, and Cora Love appeal from their convictions and sentencings after a jury trial on various drug-related charges.  The jury found all four appellants guilty of distributing cocaine and heroin, in violation of 21 U.S.C. § 841(a)(1), and of conspiracy to distribute cocaine and heroin, in violation 21 U.S.C. § 846. Three defendants, Edmonds, Duncan, and Carlton Love, were found guilty of knowingly and intentionally using a communication facility in committing, causing, and facilitating the conspiracy to distribute cocaine and heroin, in violation of 21 U.S.C. § 843(b).  Edmonds also was convicted of money laundering under 18 U.S.C. § 1956, and of managing, supervising, and organizing a continuing criminal enterprise ("CCE"), under 21 U.S.C. § 848. On top of those convictions, the jury returned a verdict of

$27,000,000 for the government against Edmonds, $4,500,000 against Carlton Love, and $4,000,000 against Duncan under the criminal forfeiture statute, 21 U.S.C. § 853. These appeals have been consolidated.

The appellants raise numerous issues, three of which present close and important questions warranting this opinion. The first concerns Edmonds' conviction on the charge of managing, supervising, and organizing a continuing criminal enterprise in violation of 21 U.S.C. § 848. Following our decision in United States v. Echeverri, 854 F.2d 638 (3d Cir. 1988), we hold that the trial court committed reversible error when it refused to instruct the jury that it had to unanimously agree which of Edmonds' alleged drug violations constituted "the continuing series of violations" required for conviction on that count.

The second issue concerns the sentences imposed on Carlton Love and Cora Love. Those two appellants argue that the drug quantities attributed to them for sentencing purposes were not justified by the evidence presented at trial. We agree. An appropriate drug-weight estimate will lower Carlton Love's U.S. Sentencing Guideline offense level; accordingly, we will remand his case for resentencing. It is unclear whether an appropriate drug-weight estimate would change Cora Love's offense level, so we will remand her case for further findings and, if necessary, a reconsideration of her sentence.

The final issue involves the district court's admission into evidence of certain drug paraphernalia seized during the execution of a search warrant.  Carlton Love claims that the search warrant was issued on the basis of an affidavit containing information allegedly obtained in violation of his Fourth Amendment rights.  We find no Fourth Amendment violation and accordingly cannot fault the challenged evidentiary ruling.

I.

This case involves a large conspiracy to distribute cocaine and heroin through the Federal Express system. The conspirators, for over a year, would ship drugs from the Los Angeles area via Federal Express to points in the East Coast and Midwest. Various members of the conspiracy then would distribute the drugs, collect money in return, and ship the money received back to California, again using Federal Express. Headed by Edmonds, the conspiracy sold more than 1500 kilograms of cocaine and more than 2 kilograms of heroin to distributors in Chester, Pennsylvania; Philadelphia, Pennsylvania; Wilmington, Delaware; Wilmington, North Carolina; Detroit, Michigan; New Orleans, Louisiana; Toledo, Ohio; and elsewhere.

Edmonds arranged the drug shipments from the Los Angeles area with the help of codefendant Reinard Mozell and one or two others. Tyria H. Ekwensi managed the distribution operation for the East Coast and the Detroit area. During the early part of the conspiracy, Edmonds would send shipments to Ekwensi's address in Mount Laurel, New Jersey. Ekwensi passed the drugs on to Duncan, her sole distributor at that time, who then sold the drugs on consignment. As the conspiracy progressed, Ekwensi also began to distribute the drugs to Russell Freeman, Jr. and to Carlton Love. At one point, Edmonds started to send the shipments directly to addresses provided by both Duncan and Freeman, Jr., as well as Ekwensi.

During the early part of these operations, Ekwensi would secret monies received from selling the drugs on her person and personally deliver the money to Edmonds in California. Edmonds eventually changed that procedure and Ekwensi proceeded to send packages of money by Federal Express to various Edmonds-controlled Los Angeles-area addresses. Carlton Love, Duncan, and Freeman, Jr. assisted Ekwensi with preparing the money for shipment and delivering the boxes to Federal Express.

The scheme began to unravel when a Federal Express employee at the Philadelphia airport became suspicious of a package that had been presented for shipment to the Los Angeles area. He opened the package and discovered that it contained a large amount of currency. Shortly thereafter, the same Federal Express employee noticed a similar package. He alerted the Federal Express security department, which in turn alerted law enforcement authorities. The package was searched and found to contain approximately $200,000 in cash.

In the course of the next several months, the FBI checked Federal Express records and seized a number of Federal Express packages containing cash sent from the Philadelphia area to the Los Angeles area as well as a number packages containing drugs sent from the Los Angeles area to the Philadelphia area. On May 29, 1992, the government secured the first of a series of wire and electronic communications warrants on telephones subscribed to or used by subjects of the investigation. The

wiretaps led to seizures and physical surveillance.  This

evidence, coupled with the ultimate cooperation of a number of

the suspects of the investigation, led to the indictment of

sixteen individuals, some from the Los Angeles area and others

from the Philadelphia area.  Ekwensi and Mozell testified for the

government at trial.

The appellants were tried, convicted and sentenced in

the U.S. District Court for the Eastern District of Pennsylvania.

We have jurisdiction to hear these appeals under 28 U.S.C.

§ 1291.


II.

The jury found Edmonds guilty of managing, supervising,

or organizing five or more persons in a continuing criminal

enterprise, in violation of 21 U.S.C. § 848.[1]  Edmonds gives two

---

[1].  Section 848(a)(1) makes it a crime to engage in a "continuing
criminal enterprise."  Section 848(b) provides that a person
engages in a "continuing criminal enterprise if --

     (1) he violates any provision of this subchapter or
subchapter II of this chapter the punishment for which is a
felony, and

     (2) such violation is a part of a continuing series of
violations of this subchapter or subchapter II of this
   chapter --
                    (A) which are undertaken by such person
            in concert with five or more other persons
            with respect to whom such person occupies a
            position of organizer, a supervisory
            position, or any other position of
            management, and

reasons why that conviction should be reversed.  His first is that the government failed to meet the statute's "numerosity" requirement; that is, he contends that the government failed to prove that he managed, supervised, or organized five or more people in connection with the underlying drug felonies.  Our examination of the record reveals that there in fact was sufficient evidence to support a finding that Edmonds managed, supervised, or organized five or more people in connection with the underlying drug felonies.

Edmonds' second reason for challenging his CCE conviction is more substantial.  He contends that the trial court erroneously refused to instruct the jury that it had to unanimously agree which of the alleged violations constituted the "continuing series of violations" required for a conviction on the CCE charge.  We agree that the trial court's refusal to give such an instruction requires a reversal of Edmonds' conviction on the CCE charge.

A.

To obtain a conviction under the continuing criminal enterprise statute, 21 U.S.C. § 848, the government must prove that the defendant, through his or her supervisory role over a criminal enterprise of five or more others, is criminally

(..continued)
            (B) from which such person obtains
        substantial income or resources."

responsible for a "continuing series" of felony violations of the federal narcotics laws. A "series" in this context is established by proof of three or more violations. See United States v. Echeverri, 854 F.2d 638, 642-43 (3d Cir. 1988). "Continuing," on the other hand, means that the three violations must somehow be related; it is well-established, for example, that clearly "isolated," and accordingly unrelated, violations of the federal drug laws will not support a CCE conviction. United States v. Jones, 801 F.2d 304, 307 (8th Cir. 1986) (noting that three separate, unrelated, drug sales would not establish a continuing series); see also United States v. Baker, 905 F.2d 1100, 1104 (7th Cir.) (stating that "an unrelated conspiracy does not count [for CCE purposes] because it cannot be part of the 'continuing' series"), cert. denied, 498 U.S. 876, and cert. denied, 498 U.S. 904 (1990), and cert. denied, 498 U.S. 1030 (1991). Furthermore, the law is clear that the "continuing series" requirement is an element of the crime. See, e.g., United States v. Grayson, 795 F.2d 278, 283-84 (3d Cir. 1986) (stating that the government must prove that a felony violation of the narcotics law is "part of a continuing series of violations"), cert. denied, 479 U.S. 1054, and cert. denied, 481 U.S. 1018 (1987). As a result, to convict, a jury must agree unanimously that the defendant committed a continuing series of three drug-related criminal offenses. See, e.g., In re Winship, 397 U.S. 358, 364 (1970).

The district court in this case instructed the jury that "[a] continuing series of violations requires proof beyond a reasonable doubt that three or more violations occurred and that they, those three or more, were related to each other." Edmonds asked the district court to explain to the jury that it must unanimously agree <u>which three</u> of any narcotics violations they found to have occurred were related to each other for the purposes of the "continuing series" requirement. The district court declined to so instruct the jury, and Edmonds insists that this was reversible error.

The defendant in <u>Echeverri</u> also was charged with a CCE offense. He requested the following jury instruction:

> The second element the government must prove
> beyond a reasonable doubt is that this
> offense was part of a continuing series of
> violations of the federal narcotics laws. A
> continuing series of violations is three or
> more violations of the federal narcotics laws
> committed over a definite period of time.
> You must unanimously agree on which three
> acts constitute the continuing series of
> violations.

<u>Echeverri</u>, 854 F.2d at 642. We held that it was reversible error for the district court to decline to give this or a similar instruction. We explained:

> In the absence of a specific unanimity
> instruction directed to the government's
> several claims, it was apparent that the jury
> need not have unanimously agreed that any
> particular criminal act had been committed by
> the defendant.

\* \* \* \*

> Here, the jury was instructed that the
> continuing series element required them to
> find three violations of the drug laws . . .,
> yet as a result of the district court's
> refusal to give the requested instruction,
> there is no assurance that the jury
> unanimously agreed that the same narcotics
> violations occurred.

Id. at 642-43.

There is a difference between the facts of this case and those presented in Echeverri. The jury convicted Edmonds of each of the eight substantive counts involving the drug felonies alleged to constitute the continuing series. As a matter of logic, therefore, the jurors must have unanimously agreed that Edmonds committed every felony in the alleged "series." Thus, the government maintains, the principles requiring a reversal in Echeverri do not require a reversal in this case.

This misunderstands Edmonds' argument. Edmonds does not dispute that the jury unanimously found he committed every one of the eight underlying narcotics violations. His argument instead is that the instruction given by the trial court did not require the jury to unanimously agree that the same three or more violations were "related" to each other for the purposes of the CCE statute. He thus contends that the mere fact that the jury returned a guilty verdict on the substantive counts involving the eight underlying offenses does not, by itself, establish that the jury found that the eight offenses, or any particular subset of three or more of the eight offenses, were related to each other.

It is possible, as Edmonds insists, that the jury, while finding that all eight violations occurred, did not actually agree on which violations were related to each other. For example, six jurors could have felt that violations A, B, and C (but no others) were related and the other six jurors could have concluded that D, E, and F (but no others) were related. Thus, as in Echeverri, it is possible that the jurors failed to unanimously agree that Edmonds was responsible for three related criminal acts and that the government therefore failed to meet its burden of proving a "continuing series" of violations.

### B.

The government maintains that United States v. Jackson, 879 F.2d 85 (3d Cir. 1989), requires that we affirm Edmonds' CCE conviction. The defendant in Jackson, who was also charged with a CCE offense, claimed that the jurors had to decide unanimously on the identities of his five underlings before they could conclude that the government had met its burden of showing that he acted in a "supervisory role." We agreed with the defendant that whether there were five or more underlings was in fact an essential element of the offense and that the jury accordingly had to reach a consensus on that fact. Id. at 88. We nevertheless rejected the notion that the jury must unanimously agree on the identities of the five underlings. Id.

The result in Jackson follows from the general rule that jurors need not be in "complete agreement as to the collateral or underlying facts which relate to the manner in which the culpable conduct was undertaken."  Id. (emphasis added); see generally Schad v. Arizona, 501 U.S. 624, 631–37 (1991) (noting that the Constitution does not require jurors to "agree upon a single means of commission"); Griffin v. United States, 502 U.S. 46, 49–57 (1991).  The elements of the crime proscribed by § 848, as viewed by the court in Jackson, are that (1) the defendant committed three drug felonies, and (2) each of those felonies were (a) related to each other, (b) undertaken in concert with five or more people whom the defendant organized or managed, and (c) produced substantial income or resources for the defendant.  Satisfaction of element (2)(b) requires proof that a group of a certain size be involved in the commission of the felony.  The identities of the people making up the group of underlings for the purposes of the CCE statute merely relate to the manner in which the culpable conduct is undertaken, however.  Put simply, the CCE statute does not care who the five people are, it only cares that the jurors agreed on the essential facts of "whether the requisite size and level of control existed."  Jackson, 879 F.2d at 89; see also United States v. Bafia, 949 F.2d 1465, 1471 (7th Cir. 1991) (holding that it is not necessary that the same five people be involved when each of the criminal acts constituting the series is committed).

Under traditional principles of our criminal jurisprudence, the legislature, within constitutional limits not here implicated, can define a crime as it chooses. <u>Schad</u>, 501 U.S. at 632-37. Once the elements have been described, however, each must be proved to a unanimous jury beyond a reasonable doubt. <u>Echeverri</u>, 854 F.2d at 642-43. When a statute makes it a crime to engage in particular conduct on a single occasion and a jury unanimously agrees that a single event occurred involving conduct of the defendant and a state of mind that fit the statutory definition of the offense, we do not insist that the jury unanimously agree on the precise manner in which the offense was committed. The same analysis applies when the crime charged involves a series of events. When a jury unanimously agrees that a single set of events occurred involving actions of the defendant and a state of mind that fit the statutory definition of the offense, we do not insist that the jury unanimously agree on the manner in which the offense was committed. Thus, in <u>Jackson</u>, the jury unanimously agreed that a single set of events occurred and that individually and collectively those events fell within the statutory definition: the defendant participated in each event, each event was a violation of a controlled substance statute, each was related to two or more other such violations, each was engaged in by the defendant through an organization of the requisite size, and each produced substantial gain for the defendant. This was sufficient. It was not necessary that the

jury unanimously agree as to the identities of the five underlings in each instance.

Here we have quite a different situation.  We do not know that the jury unanimously agreed that Edmonds participated in a single set of events that met all of the elements of the statutory definition.  Because no event can meet the statutory criteria unless the distribution involved was related to two or more other distributions, the district court's charge leaves us without the requisite assurance that no juror had a reasonable doubt concerning Edmonds' guilt of the CCE charge.  A juror may have had a reasonable doubt about the "relatedness" of one or more of the events that his or her colleagues thought constituted a series of three related drug offenses.

Thus, Jackson is inapposite here.  To apply Jackson in this context would be to disregard as irrelevant the portions of the CCE statute requiring that the underlying criminal acts be of a particular character, i.e., that they be related.  That is precisely the result we rejected in Echeverri.  The required underlying criminal acts, including their "relatedness," are "facts necessary to constitute the crime" -- not merely immaterial means -- and therefore must be proven individually. In re Winship, 397 U.S. 358, 364 (1970).  Consistent with Jackson, the jury need not agree on how the three violation events were related, but they must agree that the defendant participated in three specific events and that those events were

related. Not requiring unanimity on which three or more criminal acts are related leaves open the possibility that Edmonds could have been convicted without unanimous juror agreement that he engaged in a "continuing series" of criminal acts, that is, without unanimous agreement that he committed the crime charged.

We are aware that the U.S. Court of Appeals for the Seventh Circuit has declined to follow our decision in Echeverri. United States v. Canino, 949 F.2d 928, 947–48 (7th Cir. 1991), cert. denied, 112 S. Ct. 1701, and cert. denied, 112 S. Ct. 1940, and cert. denied, 112 S. Ct. 1954 (1992). The court there argued that the result in Echeverri "is at odds with the purpose of the [CCE statute] which is interested in punishing a defendant whom the jury is convinced was involved in a related series of drug activity with relevant frequency. It is the defendant's demonstrated frequency in participating in conspiratorial drug offenses that is the focus of the [CCE] offense, rather than any particularization of the acts used to demonstrate 'continuous.'" Id. at 948 n.7.

We respectfully disagree with the Seventh Circuit's analysis. Implicit in its approach is the view that the predicate offenses making up a "continuous series" of violations and their "relatedness," like the identities of the underlings, are immaterial "means" and not material elements of the crime requiring specific juror agreement. The court reasoned, for example, that "the exact specification by unanimous jury consent

of any particular three of a greater number of offenses is irrelevant to any theory about why punishment should be enhanced for such uniquely antisocial activity." Id. at 948. We believe Congress drafted the CCE statute as it did because it regarded the existence of a series of related offenses as material to whether the substantially enhanced punishment there provided is appropriate. Moreover, in the absence of evidence that Congress intended to depart from the traditional approach of our criminal jurisprudence, we decline to attribute to it an intent that this enhanced punishment be visited on a defendant where the jury is unable to agree beyond a reasonable doubt that the defendant participated in three specific events constituting such a series.

The relevant point is not, as the Seventh Circuit views it, whether a person who commits three related drug violations with the requisite sized group on May 12th, 13th, and 14th of a given year is as culpable as if he or she commits similar violations with the requisite sized group on June 12th, 13th, and 14th. The relevant point is that a person cannot be held criminally responsible if half of the jury believes the defendant committed the conduct described by the statute on May 12th, 13th, and 14th, but not in June, and the other half believes the defendant committed the conduct described by the statute on June 12th, 13th, and 14th, but not in May. Cf. Schad, 501 U.S. at 651 (Scalia, J., concurring) (stating that "moral equivalence" would not justify upholding an assault conviction where a portion of

the jury may have believed the defendant assaulted X on Tuesday, while the other half may have believed the defendant assaulted Y on Wednesday).

This case is governed by Echeverri and its forbearers,[2] not Jackson.  We are confronted here with a situation in which the trial court correctly charged that a "continuing series," that is, "three or more violations . . . related to each other," was an element of the offense and that the jury must unanimously agree on each element of the offense.  However, the trial court failed to further explain what unanimity meant in this context.  Although this may not have been plain error had Edmonds not requested a more specific explanation, he did so request.[3]

C.

That the trial court erred in not giving the appropriate unanimity instruction does not end our inquiry, however.  We still must determine whether we could affirm Edmonds' CCE conviction on the ground that the failure to give

[2].  E.g., United States v. Beros, 833 F.2d 455 (3d Cir. 1987).

[3].  In United States v. Anderson, 859 F.2d 1171 (3d Cir. 1988), we held that the failure to give a further explanation in a similar situation in the absence of a request was not plain error.  The appellant did not make the same argument made here about the requirement of relatedness.  Rather, he complained about the failure to instruct specifically that three criminal acts were required and that the jury had to unanimously agree on which three criminal acts occurred.  We found that the district court erred but that its error did not result in plain error because the jury unanimously found the appellant guilty of three counts of distribution and one count of conspiracy.  Id. at 1175.

the proper instruction was harmless error. Given the evidence in this case, it is difficult to believe that a rational jury who was convinced beyond a reasonable doubt that Edmonds committed all eight of the violations alleged to constitute the "continuing series," would then have failed to conclude that each and every one of those acts were related. The evidence that the jury must have credited to convict Edmonds of the eight crimes alleged to constitute the series established that there was a single, on-going scheme and that Edmonds used the same packers and method of distribution throughout the relevant period. Nevertheless, we conclude that the Supreme Court's decision in <u>Sullivan v. Louisiana</u>, 113 S. Ct. 2078 (1993), precludes us from engaging in a harmless error analysis.

<u>Sullivan</u> concerned the propriety of appellate courts engaging in harmless error analysis where the jury instructions gave an unconstitutional definition of reasonable doubt.[4] The Court ruled that permitting harmless error analysis in that

---

[4]. The trial judge in <u>Sullivan</u> gave a definition of reasonable doubt essentially identical to the definition the Supreme Court had held unconstitutional in <u>Cage v. Louisiana</u>, 498 U.S. 39 (1990) (per curiam). The charge held unconstitutional in <u>Cage</u> explained that reasonable doubt "must be such doubt as would give rise to grave uncertainty . . . . It is an actual substantial doubt. . . . What is required is not an absolute or mathematical certainty, but a moral certainty." <u>Id.</u> at 40. The Court in <u>Cage</u> ruled that given this instruction "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." <u>Id.</u> at 41.

situation would violate the defendant's Sixth Amendment right to a jury trial.  It explained:

> Since [the jury never found the defendant guilty beyond a reasonable doubt,] there has been no jury verdict within the meaning of the Sixth Amendment [and] the entire premise of Chapman [v. California, 386 U.S. 18 (1967),] review is simply absent.  There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the _same_ verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless.  There is no _object_ so to speak, upon which harmless error scrutiny can operate.  The most an appellate court can conclude is that a jury _would surely have found_ petitioner guilty beyond a reasonable doubt -- not that the jury's actual finding of guilty beyond a reasonable doubt _would surely not have been different_ absent the constitutional error. . . .  The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty.

Sullivan, 113 S. Ct. at 2082.

The relatedness requirement is an element of the CCE offense.  Accordingly, the government was required to prove, and the jury was required to unanimously find, relatedness beyond a reasonable doubt.  See Sullivan, 113 S. Ct. at 2080.  The jury instruction in this case therefore permitted the jury to return a nonunanimous verdict on an element of the offense.  Thus, as in Sullivan, there has been no actual jury finding of guilty on the CCE charge against Edmonds.  Under Sullivan, we cannot rule that

the error was harmless.[5]  It follows that Edmonds' CCE conviction

must be reversed.

III.

Carlton Love and Cora Love maintain that the trial

court improperly attributed to them for sentencing purposes a

larger quantity of narcotics than was justified by the trial

evidence.  When reviewing a district court's sentencing

decisions, a court of appeals has plenary review over legal

questions about the meaning of the Sentencing Guidelines.  United

States v. Fuentes, 954 F.2d 151, 152-53 (3d Cir.), cert. denied,

112 S. Ct. 2950 (1992).  The factual determinations underlying

the application of the Guidelines are reviewed under the clearly

erroneous standard.  Id.  When a district court employs an

appropriate legal standard, we will not disturb its determination

---

[5].  Rose v. Clark, 478 U.S. 570, 580 (1986), does not require a
different result.  There, the Court held that a jury-instruction
error erecting a presumption regarding an element of the offense
(malice), while violating Fourteenth Amendment, nevertheless was
harmless error.  Although the jury there was instructed to
presume malice from certain predicate facts, it still was
required to find the existence of those facts beyond a reasonable
doubt.  The Court concluded that a finding of the underlying
facts there was "functionally equivalent" to finding the presumed
element of malice.  Here, on the other hand, the government asks
us to assume relatedness from the mere fact that Edmonds was
found guilty on each of the underlying violations.  This would
require us to engage in pure speculation -- to impose our "view
of what a reasonable jury would have done."  Sullivan, 113 S. Ct.
at 2082.  To do so would impermissibly permit the "wrong entity
[to] judge the defendant guilty."  Rose, 478 U.S. at 578.  That,
we cannot do.

of the amount of drugs attributable to a particular defendant unless that determination is clearly erroneous.  <u>United States v. Nagi</u>, 947 F.2d 211, 215 (6th Cir. 1991), <u>cert. denied</u>, 112 S. Ct. 2309, <u>and cert. denied</u>, 112 S. Ct. 2309 (1992).

## A.

The district court determined that Carlton Love was involved in a conspiracy to distribute at least 500 kilograms of cocaine and 3 kilograms of heroin.  The government originally attributed nine different shipments or requests for shipments of cocaine to Carlton Love.  The government now has admitted that it has insufficient evidence to attribute to Carlton Love the final 100 kgs shipment of cocaine.  Our calculations reveal that this fact alone will reduce his offense level to 40.  Accordingly, we will remand his case for resentencing.[6]

## B.

---

[6]. Based on a cocaine attribution of over 500 kgs and a heroin attribution of 3 kgs, the district court determined Carlton to have a base offense level of 40 in accordance with the drug quantity table contained in USSG §2D1.1(c)(2).  At a criminal history category of I, and with a two-level increase for possession of a firearm in connection with drug-trafficking activities, Carlton's sentencing range was 360 months to life. The district court sentenced Carlton to 360 months.  If less than 500 kgs of cocaine are attributed to Carlton, he falls under § 2D1.1(c)(3), which reduces his base offense level from 40 to 38, and, with the two-level increase for possession of a firearm, yields a sentence of 292 to 365 months.

The district court attributed four separate shipments of cocaine to Cora Love.[7] Each shipment originated in the Philadelphia area and was transported to Detroit in rental cars driven by Russell Freeman, Sr. Cora Love was among those who met Freeman, Sr. at a Detroit hotel at the end of each of these four trips. She also was the person who each time paid Freeman, Sr. a courier fee. The government argues that the record supports a finding that the first shipment weighed 25 kgs and that the second through fourth shipments weighed 50 kgs each. Accordingly, it attributes a total of 175 kgs of cocaine to Cora Love for sentencing purposes. Our review of the record has disclosed the following evidence with respect to each of the four shipments.

Russell Freeman, Jr. testified that his father made four trips to Chicago in late 1991 and 1992 and that on each

---

[7]. Cora Love denies that any of these four shipments should be attributed to her, claiming that she was an unwitting courier. The record contains ample evidence supporting the district court's conclusion that she knew exactly what she was doing, however. She drove a car on four occasions to pick up sealed suitcases of cocaine upon their arrival in Detroit. She also handed Russell Freeman, Sr. money for the drugs. In addition, she brought Ekwensi a package of Bounce Fabric Softener sheets from the store Cora Love managed so that Ekwensi could package drug money for transport. (Bounce apparently makes the presence of drug residue on the money more difficult to detect.) Further, Cora Love at one point told Ekwensi, as the two were about to meet Freeman, Sr., not "to look too obvious" and to "just look casual about it." (App. at 754.) We accordingly conclude that the trial court's ruling that Cora Love was involved in these four shipments was not clearly erroneous.

occasion his father transported between 35 kgs and 50 kgs of cocaine.

The first shipment -- Russell Freeman, Sr. testified that he first transported cocaine to Detroit in December 1991. That first shipment consisted of two suitcases. Ekwensi testified that she met Freeman, Sr. upon his arrival in Detroit and that she carried the lighter of the two suitcases to the car driven by Cora Love. Ekwensi further testified that "there was about 12 keys in one of the pilot cases" (the one she carried) and that "[Freeman, Sr.] carried the heavy one." (Supp. app. III at 55a.) The district court attributed 25 kgs of cocaine to Cora Love for this first shipment, and Cora Love does not contest this attribution.

The second shipment -- The second shipment also occurred in December 1991, "just before Christmas." Freeman, Sr. testified that he again delivered two suitcases, although he did not state how much each suitcase weighed. The government contends that this evidence, coupled with Freeman, Jr.'s statement that each of his father's deliveries weighed between 35 kgs and 50 kgs, supports the district court's finding that the shipment contained 50 kgs of cocaine.

The third shipment -- Freeman, Sr. delivered the third shipment to Detroit in January 1992. Ekwensi estimated that the shipment weighed "[a]nywhere from 40 to 50 keys, leaning more toward 50 keys." From this, the government concluded that Cora

Love should be attributed an additional 50 kgs.  The district court agreed.

The fourth shipment -- The court found that the final shipment attributable to Cora Love also weighed 50 kgs.  The most precise evidence regarding this shipment came from Ekwensi, who indeed testified at first that the shipment weighed 50 kgs.  She then stated that she lowered the price she charged Carlton Love for the drugs after he pointed out that each "kilogram" was missing four ounces.  One ounce weighs 28.349 grams.  Accordingly, if one takes into account the reduction, the shipment weighed roughly 5.5 kgs less than the 50 kgs that the court attributed to Cora Love on the fourth shipment.

The district court thus attributed 175 kgs to Cora Love.  Any attribution of more than 150 kgs results in an offense level of 38, the offense level utilized in determining Cora Love's sentence.  We believe there is evidence from which a fact finder, with appropriate findings and explanations, could properly attribute to Cora Love either more or less than 150 kgs.  We cannot, however, sustain the district court's allocation based on the current record.

Attributing quantities of drugs for sentencing purposes is an oft-recurring task for district judges.  The magnitude of the consequences that can flow under the Sentencing Guidelines from one attribution rather than another make this a very important undertaking.  It can also be a very difficult one, in

part because precise drug-weight information is frequently not available. Because the available relevant information is often imprecise, the Guidelines recognize that the sentencing scheme they contemplate cannot work unless judges are authorized to estimate the quantity of drugs possessed or distributed on a particular occasion. See, e.g., USSG. § 2D1.1 application note 12 ("where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance"). We have cautioned, however, that the necessity of estimating drug weights for sentencing purposes "is not a license to calculate drug amounts by guesswork." United States v. Paulino, 996 F.2d 1541, 1545 (3d Cir.), cert. denied, 114 S. Ct. 449, and cert. denied, 114 S. Ct. 618 (1993).

The government has the burden of providing a rational basis for an assessment of drug weight and a sentencing court has the responsibility of identifying a rational basis for the attribution it ultimately makes, assuming that basis is not otherwise obvious from the record. In the absence of such evidentiary support and an appropriate explanation, the Guidelines sentencing process can exact grave sanctions on a wholly arbitrary basis. While a sentencing judge cannot insist on being satisfied that a particular weight is more likely than not the historically correct weight, he or she can insist that the government provide information from which the court can

conclude that more likely than not the historically correct weight equaled or exceeded the weight attributed.  See Paulino, 996 F.2d at 1545 (stating that "the sentencing court must carefully scrutinize the government's proof to ensure that its estimates are supported by a preponderance of the evidence"); see also United States v. Collado, 975 F.2d 985, 998 (3d Cir. 1992) (same).

When a law enforcement officer or lay person familiar with a drug indicates that he or she has observed or handled a quantity of drugs and estimates that it weighed five kilograms, there is a rational basis for the court to estimate the weight at five kilograms.  When such a person estimates the weight to be between four and six kilograms and it is apparent that he or she is simply taking into account that he or she is making an approximation, there is a similar rational basis for the court to estimate the weight at five kilograms.  But where a knowledgeable person provides a range of weights, this alone does not provide a rational basis for attributing to the defendant the highest weight in that range.

Thus, in this case, we do not believe that Ekwensi's testimony that the cocaine in the third shipment weighed "[a]nywhere from 40 to 50 keys" provides a rational basis for attributing 50 kilograms to Cora Love even though Ekwensi added the modification "leaning more towards 50 keys."  Nor do we believe that Freeman, Jr.'s testimony, without more, can supply a

rational basis for concluding that the weight of the cocaine on the second trip was 50 kgs.  As with Ekwensi's testimony about the third shipment, a sentencing judge may not arbitrarily select the highest figure in an estimated range of weights.

Moreover, we believe Freeman, Jr.'s testimony would not warrant a judge in assigning the average of 35 kgs and 50 kgs, or 42.5 kgs to each of the four shipments.  It seems apparent from its context that Freeman, Jr.'s 35 kgs to 50 kgs statement was not intended either as an estimate of a constant amount of drugs transported on each of the four occasions or as an estimate of the average weight of the shipments.  Rather, he appears to be saying that the smallest shipment was 35 kgs, the largest was 50 kgs, and the other two shipments were no smaller or larger.  If the district court concludes that this is the import of Freeman, Jr.'s testimony, that testimony would not justify an approach which would merely strike an average between 35 kgs and 50 kgs.

There is evidence, we believe, from which a trier of fact could conclude that Freeman, Jr. packed his father's car with cocaine before the start of each trip and that he was keeping track of the quantity of drugs being delivered in each instance.  If the district court concludes that this was the case and that the import of his testimony was as we have hypothesized, we believe Freeman, Jr.'s testimony would provide a rational basis for a finding that the total weight of the four shipments

was at least 155 kgs (i.e., one shipment of 35 kgs, one of 50 kgs and two of at least 35 kgs).

Turning to the evidence concerning the fourth shipment, we conclude that Ekwensi's testimony cannot, without further explanation, support a finding that 50 kgs were transported on this occasion. Without the benefit of an explanation from the district court, we can think of no rational basis on which a trier of fact could accept her initial testimony that the weight was 50 kgs without also crediting her acknowledgement that she was forced to drop the price because each kilogram was missing four ounces.

As the court observed in United States v. Sepulveda, 15 F.3d 1161, 1199 (1st Cir. 1993), cert. denied, 114 S. Ct. 2714 (1994), a "sentencing court remains free to make judicious use of properly constructed averages." But this does not relieve the government of its burden of providing the court with sufficient information to permit a conclusion that the average more likely than not is equal or less than the historically accurate weight of the drugs attributable to the defendant. While we believe it may be possible to conclude from this record that, more likely than not, the four shipments totalled in excess of 150 kilograms, that conclusion would have to be based on factual findings that the district court has yet to make. Accordingly, we will remand Cora Love's case to the district court for more fact finding and possible resentencing.

IV.

On August 12, 1992, FBI agents attempted to arrest Carlton Love at his residence in an apartment complex on Riverside Drive in Southfield, Michigan, pursuant to an arrest warrant. The warrant application was supported by an affidavit that summarized the results of the FBI's six months of investigation. That affidavit provided information about thirty-one Federal Express shipments containing illegal drugs sent to addresses associated with the nationwide cocaine- and heroin-distribution operation and referred to telephone conversations which had been intercepted in which Carlton Love and Ekwensi discussed drug and money transactions. Included with the excerpts of the conversations between the co-conspirators were the agent's suggested interpretations of the dialogue, based upon his experience and expertise in drug trafficking investigations. Based upon the information in the affidavit, the magistrate properly concluded that there was a fair probability Carlton Love was engaged in illegal drug trafficking.

When the FBI agents entered Carlton Love's apartment with the warrant for his arrest, they did not find him there. They did, however, find drug paraphernalia in plain view. This evidence was seized after the agents secured a search warrant based on the information contained in the arrest warrant

affidavit and what they had learned during their visit to Carlton Love's apartment.

Love acknowledges that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is a reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980). He insists, however, that the agents had no reasonable grounds for believing that he was at home when they entered his apartment with the arrest warrant. He maintains that, as a result, the search warrant was invalid and the items seized under its authority should have been suppressed. The district court concluded that the agents had reason to believe Carlton Love was in his apartment on the morning of August 12th, and we agree.

The agents' investigation disclosed that Carlton Love signed the lease and paid the rent for apartment 1725 at 23600 Riverside Drive. The gas service account was in his name and the telephone was listed in the name of his mother. On August 11th, a management representative of the apartment complex, during a visit from the agents, confirmed that Carlton Love lived in the apartment and that he used the black Ford Mustang then parked immediately in front of the apartment.

The agents asked the management representative to call if Carlton Love was seen in the complex. Later that day, the agents were called and advised that he had been observed exiting

his apartment and departing the area. Thus, as of the evening of August 11th, the agents had current information indicating that Carlton Love was then living in the apartment.

The agents came to the apartment to arrest Carlton Love at 6:45 a.m., early enough that it was unlikely someone living in the apartment would have already departed for the day. On their arrival, they observed the black Mustang parked in front of the apartment. They maintained surveillance as other residents of the complex departed for their daily activities. By 9:30 a.m. all of the vehicles near the apartment except the black Mustang were gone. No one had left the Love apartment. At approximately 9:40 a.m., the agents entered the exterior door and proceeded to the interior door of apartment 1725. Simultaneously, they called the telephone number of the apartment, knocked on the door, and announced their presence. There was no response. The agents "thought that there was a good possibility that [Love] was in there hiding."

The agents then called an Assistant United States Attorney to secure his opinion as to whether they had probable cause to enter the apartment to search for Carlton Love. After receiving an affirmative response, they again called, knocked, and announced themselves at the interior door to the apartment. Receiving no response, they entered using a key provided by the management.

Once inside and not finding anyone in the living room, they proceeded to the master bedroom and closet where they thought Carlton Love might be hiding. On the floor of the closet was a large cardboard box containing "plastic baggy material" and a vinyl case similar to cases they had previously seen used to carry three beam scales. They left the apartment and sought a search warrant. Carlton Love was arrested the following day while boarding an airplane.

Carlton Love stresses that the last sighting of him prior to the entry of the agents had been of him leaving the apartment. In his view, from this fact and the fact that the agents received no response to their simultaneous call and knock, the agents undoubtedly realized, or should have realized, that he was not in the apartment on the morning of August 12th. In our view, while the information available to the agents clearly did not exclude the possibility that Carlton Love was not in the apartment, the agents had reasonable grounds for concluding that he was there. Normally, a person who is currently living at an apartment returns there at some point to spend the night and does not leave prior to 6:45 a.m. The presence of the black Mustang immediately in front of the Love apartment tended to confirm what one would normally expect and this expectation was not dispelled by the fact that someone probably involved in a drug operation did not appear when the agents announced themselves at his door.

V.

We have considered the remaining issues raised by the appellants and have concluded that they do not warrant a reversal of their convictions or a change in their sentences.[8]

VI.

For the foregoing reasons, we will reverse the judgment of the district court against Theodore Edmonds on the charge of managing, supervising, and organizing a continuing criminal enterprise, in violation of 21 U.S.C. § 848. The district court's sentences of Cora Love and Carlton Love will be vacated

---

[8]. Those remaining issues, as articulated by the appellants, are: First, all the appellants maintain that the trial court erred in admitting wiretap evidence at trial, alleging that both the affidavits in support of the wiretaps and the orders authorizing the wiretaps did not meet the requirements of 18 U.S.C. § 2518. Second, all appellants maintain that they were denied a fair trial because the trial judge persistently interfered with and placed improper limitations on defense counsels' efforts to mount a defense. Third, all appellants except for Cora Love claim that the trial court erred when it instructed the jury that the appropriate measure of forfeiture was the "gross proceeds" received by the various defendants. Fourth, Carlton Love argues that the trial court for sentencing purposes incorrectly concluded that he possessed a firearm in connection with drug-trafficking activities. Fifth, Duncan appeals his sentencing, arguing (1) that the district court incorrectly attributed a larger portion of the narcotics to him than was justified and (2) that the court used the wrong standard when it rejected his claim that he played a minor role in the conspiracy which resulted in accomplice attribution. Finally, Duncan argues that the district court committed plain error when it admitted his co-conspirators' guilty pleas on the issue of credibility.

and their cases will be remanded for further sentencing proceedings consistent with this opinion.  We will affirm the judgments of the district court in all other respects.[9]

U.S. v. Edmonds, Duncan, Love & Love

Nos. 93-1890, 1914, 1920 & 1947

HUTCHINSON, Circuit Judge, Concurring.

I concur with the result the Court reaches in these cases and with much of the reasoning in Judge Stapleton's fine opinion.  Specifically, I agree with the Court that United States v. Echeverri, 854 F.2d 638, 642-43 (3d Cir. 1988), requires us to vacate Theodore Edmonds' conviction of managing, supervising and organizing a continuing criminal enterprise ("CCE") in violation of 21 U.S.C.A. § 848 (West 1981 & Supp. 1994).  See Opinion of

[9].  After oral argument in this case Cora Love and Carlton Love filed a motion to add an additional issue on appeal.  Their motion did not state adequate grounds explaining why they failed to raise these issues earlier, however.  Accordingly, their motion will be denied.

the Court, Part II, at 7-20; IOP 9.1. I write separately, however, to note that if this particular issue were a matter of first impression, I would be inclined to follow the reasoning of the Seventh Circuit in United States v. Canino, 949 F.2d 928, 947-48 (7th Cir. 1991), cert. denied, 112 S. Ct. 1701, and cert. denied, 112 S. Ct. 1940, and cert. denied, 112 S. Ct. 1954 (1992).

Echeverri precludes me from following that course. Nevertheless, I believe Echeverri can lead to results that are inconsistent with the purpose of the CCE statute and does so in this case where the jury convicted Edmonds of all the substantive counts involved in all of the predicate felonies. I recognize that the district court could have easily avoided the unanimity problem if it had not refused to give the jury instruction the defense requested on the need for unanimity in all respects material to a CCE case, including specifically those offenses that the jury believed were "related." Nevertheless, the Court concedes: "As a matter of logic, . . . the jurors must have unanimously agreed [in this case] that Edmonds committed every felony in the alleged `series,'" but then goes on to conclude this does not establish unanimity on relatedness. Opinion of the Court, Part II, at 11. I agree with the Court this latter conclusion is a corollary of Echeverri. See id. at 7-20.

I am dubitante on the Court's conclusion that harmless error analysis is foreclosed by Sullivan v. Louisiana, 113 S. Ct.

2078 (1993). <u>See</u> Opinion of the Court, Part II, at 18-20. Regardless, I believe the tension, which the Court recognizes, between <u>Echeverri</u> and <u>United States v. Jackson</u>, 879 F.2d 85 (3d Cir. 1989) warrants reconsideration of this unanimity requirement as it relates to a continuing criminal enterprise. Therefore, because <u>Echeverri</u> is a controlling precedent, I concur in the Court's disposition of Edmonds' appeal.

In all other respects, I am in full agreement with the reasoning in the Court's opinion.

U.S. v. Edmonds, Duncan, Love & Love,
Nos. 93-1890, 1914, 1920 & 1947


GARTH, Circuit Judge, Concurring in Part and Dissenting in Part:

I concur in all but one of the conclusions reached by the majority. And while I share Judge Hutchinson's concerns regarding the Echeverri doctrine, and believe that the conceptual tension between Echeverri and Jackson calls for further resolution, I agree that Echeverri and our Internal Operating Procedure 9.1, which precludes us from overturning an earlier panel's position, constrain our disposition of the present matter. I therefore agree that Edmonds' conviction must be reversed.

The only aspect of the majority opinion with which I differ concerns the decision to vacate Cora Love's sentence and remand her case for resentencing by the district court. I agree that arbitrariness in drug-quantity attributions cannot be tolerated. I am also in full accord with the guidelines and principles ably set forth by the majority to achieve the objective of determining a rational basis on which to predicate a defendant's sentence. See Opinion of the Court, Part III.B.

However, as I read the record, any appropriate calculation of the amount of cocaine attributable to Cora Love must exceed the threshold of 150 kgs specified in U.S.S.G.

§ 2D1.1(c)(3).[10]  I believe that the record provides ample support for the very "rational basis" which the majority requires in order to uphold Cora Love's sentence.  Indeed, I find that it cannot otherwise be read.  I thus believe it unnecessary to remand and require the district court to reconsider Cora Love's sentence.  For this reason, I respectfully dissent.

As is detailed by the majority, the record reflects four shipments attributable to Cora Love as follows:

| Shipment Number | Supporting Testimony (kgs per shipment) | Quantity – giving the benefit of the record to Cora Love |
|---|---|---|
| One | Freeman, Jr.: 35–50. Ekwensi: 25. | 25 kgs |
| Two | Freeman, Jr.: 35–50. | 42.5 kgs |
| Three | Freeman, Jr.: 35–50. Ekwensi: "40 to 50, leaning towards 50." | 45 kgs |
| Four | Freeman, Jr.: 35–50. Ekwensi: 50 – but each kg was also "short" four ounces, for a total of 44.5 kgs. | 44.5 kgs |

---

[10].Section 2D1.1(c)(3) of the 1992 United States Sentencing Guidelines provides for a base offense level of 38 for "[a]t least 150 KG but less than 500 KG of Cocaine...."  With a Criminal History Category of 0 and a two-level reduction for minor participation, Cora Love was subject to a sentence of 188–235 months.  The district court sentenced Cora Love to 188 months.

                         Total:  157 kgs


        On my reading of the record, based on Ekwensi's
testimony, which in this instance is not contested by Cora Love,
I would attribute no more than 25 kgs for the first shipment.

        As to the second shipment, I read Freeman Jr.'s
testimony that "[e]ach trip my father took it was somewhere
between 35 and 50 kilos of cocaine" (Supp. App. III p. 75a) to
yield the rational inference, not that there were four deliveries
ranging in size from 35 to 50 kgs as the majority suggests, see
Maj. Op. at 27-28, but that each of the four shipments weighed
between 35 and 50 kgs, a fact which, on the majority's own
analysis, would result in an average of 42.5 kgs for each
shipment.

        Courts have sanctioned the use of averages to compute
drug weights in other cases.  See, e.g. United States v.
McMillen, 8 F.3d 1246, 1250-51 (7th Cir. 1993); see generally
Federal Judicial Center, Guideline Sentencing: An Outline of
Appellate Case Law on Selected Issues 21-32 (1994).  And the
majority here so acknowledges.  Maj. Op. at 28.  In this case,
Freeman, Jr. has testified that each shipment weighed between 35
and 50 kgs, thereby establishing an average of 42.5 kgs for the
second shipment, as to which no other testimony was given.

        Freeman, Sr. delivered the third shipment sometime in
January of 1992.  Ekwensi estimated that the shipment weighed
"[a]nywhere from 40 to 50 keys, leaning more toward 50 keys."

Under the majority's own analysis, every reason exists to attribute to Cora Love at the least, 45 kgs.

As to the fourth shipment, I am in accord with the majority's reasoning and the majority's attribution of 44.5 kgs to Cora Love. Maj. Op. at 24.

The four shipments, therefore, total 157 kgs, and this total is reached without taking into account an additional 28 kgs referred to in Count V of the Indictment. Cora Love was convicted on this Count, and the government points out that this amount should have been included in Cora Love's attributed total, but for some reason was not. See Government's Letter Memorandum dated October 25, 1994, p. 3. If one adds this 28 kgs to the 157 kgs noted above, a total of 185 kgs results. But even if the 28 kgs are not added to the weight of the first four shipments, the total still exceeds the 150 kg threshold of § 2D1.1(c)(3).

The above calculations, which comport with each and every principle and guideline laid down by the majority, can only lead to one conclusion -- that the record, as it presently exists, yields a rational basis for attributing over 150 kgs of cocaine to Cora Love. The drug weights attributed to Cora Love, giving her every benefit of the record, necessarily exceed 150 kgs. This being so, I cannot bring myself to vote for a remand to an overworked and overburdened district court so that the court may engage in the meaningless task of resentencing Cora Love. This procedure might well entail the taking of additional

evidence and would, at the very least, require additional findings drawn from a record which, I believe, just cannot be read to reveal less than 150 kgs.

I therefore dissent from so much of the majority's judgment as would vacate Cora Love's sentence and remand her case to the district court for what I regard as a needless exercise in sentencing endeavors.