EBEL, Circuit Judge,
concurring in part and dissenting in part.
The majority states the legal standard under Payton as follows: “[DJefendants were entitled to enter the Váldez residence if there was a reasonable basis for believing that Raymond Valdez, Jr. both (1) lived in the residence and (2) could be found within at the time of entry.” Maj. Op., ante, at 1225. Applying this test, the majority found that agents McPheters and Littlewhiteman (collectively “defendants” or “agents”) possessed a reasonable basis for concluding that Raymond Nathaniel Valdez (“Raymond”) resided at his mother’s home and that he was present when they conducted their warrantless, noncon-sensual search. Because I disagree with the latter conclusion, I respectfully dissent.
I. Payton’s First Prong: Suspect’s Residence
The majority concludes that the defendants reasonably believed that Raymond resided at his mother’s home for Payton purposes. In doing so the majority, for the first time in this circuit, articulates the standard of certainty officers must have about a suspect’s residence before entering with only an arrest warrant. While ultimately I agree with the majority that the defendants have made a sufficient showing under Payton’s first requirement to entitle them to qualified immunity, I write separately on this issue to discuss what level of certainty Payton and the Fourth Amendment require an officer to possess regarding whether a suspect resides at a certain location before entering that residence on the basis of an arrest warrant alone.
The majority correctly notes that the other circuits to consider the issue have almost unanimously adopted the reasonable belief standard for residence. See Maj. Op., ante, at 1224-1225. The reasons for doing so have been articulated with varying degrees of clarity in the opinions cited by the majority. See United States v. Route, 104 F.3d 59, 62 (5th Cir.), cert. denied, 521 U.S. 1109, 117 S.Ct. 2491, 138 L.Ed.2d 998 (1997); United States v. Risse, 83 F.3d 212, 216 (8th Cir.1996); United States v. Lauter, 57 F.3d 212, 215 (2d Cir.1995); United States v. Edmonds, 52 F.3d 1236, 1248 (3d Cir.1995); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir.1995).
I have no doubt that within the qualified immunity context, the majority articulates *1229 the proper standard. In Anderson v. Creighton, the Supreme Court held that government agents performing discretionary duties are entitled to qualified immunity so long as their complained-of actions were objectively legally reasonable “assessed in light of the legal rules that were ‘clearly established’ at the time [the actions were] taken.” 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In another context, this court has recognized that in a § 1983 action, we must assess government agents’ actions under the appropriate substantive, law modified by a “reasonable officer” standard. See Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir.1995) (“When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is ‘entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest’ the plaintiff.”) (quoting Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). Here, Payton dictates the clearly established law: “[For Fourth. Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.”] Payton, 445 U.S. at 603, 100 S.Ct. 1371. While the language of Payton implicates no reasonableness standard as to a government agent’s belief regarding a suspect’s residence, the qualified immunity rationale requires that we assess whether “the suspect lives” within the “dwelling” entered according to what a reasonable officer would believe. Cf. Romero, 45 F.3d at 1476. In this case the record indicates that the officers had sufficient indicia— barely sufficient — to form a reasonable belief that Raymond resided at the Valdez family home in La Point, Utah. Accordingly, I concur with the majority that the agents have sufficiently met Payton’s first requirement for qualified immunity purposes.
II. Payton’s Second Prong: Suspect’s Presence
In order to be entitled to summary judgment based on qualified immunity, the agents also must meet the second requirement of Payton’s clearly established law— they must have possessed a “reason to believe the suspect [was] within” Mrs. Valdez’s home at the time they entered. See Payton, 445 U.S. at 603, 100 S.Ct. 1371. As the majority correctly observes, in assessing whether a government agent’s belief of presence was reasonable “courts ‘must be sensitive to common sense factors indicating a resident’s presence.’ ” Maj. Op., ante, at 1226 (quoting United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir.1995)). In this- case, common sense belies a finding that the officers had a reason to believe Raymond was within the Valdez family home in La Point, Utah when they executed their search.
The majority catalogues a number of circumstances that this and other circuit courts have recognized as bases for a reasonable belief of a suspect’s presence within his home. Specifically, the majority identifies “presence of an automobile, ... the time of day, ... operation of lights or other electrical devices, ... and the circumstances of a suspect’s employment” as recognized evidence of presence. See Maj. Op., ante, at 1226. Notwithstanding the myriad ways to infer presence and the forgiving standard for evaluating whether an officer’s belief of a suspect’s presence is reasonable, this case stands in stark contrast to those cited by the majority because the instant record is devoid of any reliable evidence known to the agents indicating that Raymond was actually home at the time of the defendants’ search.
The majority cites exactly one piece of evidence[1] in support of its conclusion that *1230 the agents reasonably believed Raymond was home when they searched his mother’s residence:
Littlewhiteman submitted an affidavit stating that he knew Raymond would probably be home around midday, since he knew Raymond was unemployed, liked to stay out late drinking, sometimes abused drugs such as heroin and cocaine, and was suspected of having committed at least two nighttime burglaries. Significantly, the plaintiff did not offer any facts which would contradict Littlewhiteman’s affidavit on Raymond’s suspected nocturnal activities.[2]
Maj. Op., ante, at 1227 (emphasis added) (footnote omitted). Based upon this “portrait of Raymond Valdez, Jr.’s night life,” the officers claim they formed a reasonable belief that Raymond would be home at noon on December 7, 1993. In my estimation, Payton’s second prong requires more.
At most, this “evidence” of Raymond’s lifestyle implicates the interrelated “time of day” and “circumstances of employment” factors identified by the majority. According to the “time of day” cases cited, ante at 1226, early morning has been recognized as a time when suspects can probably be found at home. See United States v. Edmonds, 52 F.3d 1236, 1248 (3d Cir.1995) (“The agents came to the apartment to arrest Carlton Love at 6:45 a.m., early enough that it was unlikely someone living in the apartment would have already departed for the day.”); United States v. Terry, 702 F.2d 299, 319 (2d Cir.1983) (“[T]he agents arrived at the apartment at 8:45 A.M. on a Sunday morning, a time when they could reasonably believe that Terry would be home.”). Further, this court recognized in an unpublished disposition that “8:45 p.m., on a cold, snowy evening, [is] a time when a person would reasonably be expected to be at home.” Anderson v. Campbell, No. 95-6459, 1996 WL 731244, at *3 (10th Cir.1996).
Significantly, the officers in all three of the “time of day” cases cited by the majority had other indicia of presence besides' the time of day at which they conducted their search. In Edmonds, the officers arrived at 6:45 a.m., and “[o]n their arrival, the observed the [defendant’s] black Mustang parked in front of the apartment.” 52 F.3d at 1248. In Terry, “[w]hen the agents arrived at the apartment building, a 12-year old boy wearing a shirt with the name ‘Terry’ on it told them his father and mother lived in the apartment and did not indicate that his father was not home.” 702 F.2d at 319. In Anderson, when officers approached the defendant’s front door, they observed a man through the window who had “basically the same height, weight and facial features ... [who] looked young enough for the warrant’s physical description of the suspect to have easily matched him.” Anderson, 1996 WL 731244, at *3 (quotation marks omitted). Thus, these eases stand for the proposition that “time of day” plus other *1231 indicia of presence can support Payton’s reasonable belief of presence requirement. See also United States v. Beck, 729 F.2d 1329, 1331-32 (11th Cir.1984) (“Beck’s car, identified by the agents, was parked nearby; and it was reasonable to believe that one would be at home at 7:30 a.m. and be sound asleep.... ”).
The “circumstances of a suspect’s employment” cases provide the best support for the majority’s conclusion that agents McPheters and Littlewhiteman reasonably believed Raymond was present when they searched his mother’s home. In United States v. Lauter, 57 F.3d 212, 215 (2d Cir.1995), the Second Circuit deemed reasonable an ATF agent’s belief of a suspect’s presence at his basement apartment during an 8:30 a.m. raid after a tip from a “reliable Cl” that the suspect “was unemployed and typically slept late,” and had moved into the basement apartment that weekend. That case is distinguishable, both because of the quality of the confidential informant’s information and the earlier time of morning for the entry. In United States v. Woods, 560 F.2d 660, 665 (5th Cir.1977), the Fifth Circuit acknowledged that “there is no indication in the record that the officers had reason to know whether appellant would be at his home when they went there to execute the arrest warrant,” however, the court nonetheless found “it a reasonable anticipation on the officers’ part to believe that a person would be at his place of abode, especially at 8:30 in the morning for a man not known to be working.... ” That case may similarly be distinguishable from the present case based on the early-morning nature of the search. Although to the extent it is not distinguishable, I would not follow its relaxed standard for meeting Payton’s second prong.
Here, the agents paint a vague picture of Raymond as an unemployed, late-night drinking, drug-abusing party-goer. Accepting that picture as accurate, I find that the agents presented no evidence that Raymond had engaged in any late-night activities, let alone drinking or drug abuse, the night before they conducted their search. Further, the agents presented no evidence — assuming that Raymond had painted the town the night before the search — that he retired to his mother’s house after the revelry ended. In light of the agents’ knowledge of Raymond’s “transient” nature, I find the leap too great from their general impressions of Raymond’s lifestyle to a reasonable belief that he would be present at his mother’s house at noon on the random day they chose to search. See Blake v. Peterson, No. 94-C-6561, 1995 WL 360702, at *10 (N.D.Ill. June 14, 1995) (“Even more significant [as to their belief of presence], the agents in Edmonds [, 52 F.3d at 1248,] were certain that their suspect was presently residing at the apartment that they entered pursuant to the arrest warrant. In the instant case, agents did not ... establish that the suspect actually resided at [residence searched].”). There was nothing in the record to suggest that Raymond stayed at his mother’s house on a routine or even frequent basis. Given all the other locations where he could have been on that particular day in light of his peripatetic, criminal, and unstructured lifestyle, there was absolutely no reason to believe that he was in fact in his mother’s home on that particular day at that particular time.
The majority correctly explains that “[d]irect surveillance or the actual viewing of the suspect on the premises is not required.” Maj. Op., ante, at 1226. However, officers must possess some specific facts that indicate a suspect will be found within his or her home at the time, on the day the officers decide to search, in order to justify entry into a suspect’s home based on an arrest warrant alone. By sanctioning the search of agents McPhet-ers and Littlewhiteman, the majority today almost entirely eviscerates the second requirement that Payton imposes before an agent, armed only with an arrest warrant, can enter a suspect’s home. The limited rule permitting early-morning or late-evening searches when other evidence indicates that a suspect is at home, now extends until noon. I cannot say that *1232 Payton’s “limited authority” to enter a suspect’s dwelling — “the chief evil against which the wording of the Fourth Amendment is directed,” Payton, 445 U.S. at 585, 100 S.Ct. 1371 (quotation omitted) — can be extended to almost any time of day based only on an officer’s belief that a suspect has a penchant to drink or stay out late. Because the officers here had no specific reason to believe that Raymond was drinking, abusing drugs, or out late partying the night before their December 7, 1993 search, and because the officers had no reason to believe that he would have returned to his mother’s home even if he had been engaged in any of these activities, I find their belief that he would be at his mother’s at noon on the day they decided to search to be unreasonable.

. I deal here with only the first of the two unsuccessful searches executed by the agents on December 7, 1993, at the Valdez home. For purposes of a cause of action under § 1983 predicated upon that first search, I find it irrelevant that “after the first search on December 7, a witness (Sherman DuBois) *1230 told McPheters and Littlewhiteman that he had seen Raymond at the Valdez residence earlier that day.” Maj. Op., ante, at 1227.

. Moreover, the majority’s paraphrasing of Littlewhiteman’s declaration implies a greater level of certainty regarding finding Raymond at his mother’s house at noon on December 7, 1993, than the words Littlewhiteman used under oath. Instead of stating that he "knew” that Raymond would be home around midday or that he "knew” about Raymond’s lifestyle, Littlewhiteman actually said only that he had "information” that “indicated that Valdez was unemployed, that he liked to stay out late at night drinking, that he sometimes abused drugs such as heroin and cocaine, and that he was suspected of having committed at least two burglaries which had occurred at night. Based on his lifestyle, I believed that Valdez would be at the Valdez residence when we went looking for him about noon.”
As indicated in the text of my dissent, this information is inadequate, in my opinion, to support any reasonable belief as to where Raymond could be found at noon on December 7, 1993. If anything, it merely emphasizes Raymond’s itinerate and unstructured lifestyle and it establishes that no one had any reasonable basis for concluding that he would be at his mother's home at noon on December 7.