STATE of Wisconsin, Plaintiff-Respondent,

v.

Antonio V. BLANCO,, Defendant-Appellant. [Case No. 98–3153–CR]†

STATE of Wisconsin, Plaintiff-Respondent,

v.

Nora M. AL-SHAMMARI, Defendant-Appellant.†

Antonio V. BLANCO and Rogelio Fuentez, Defendants. [ Case No. 98–3535–CR]

Court of Appeals

*Nos. 98–3153–CR, 98–3535–CR. Oral argument February 29, 2000.—Decided May 16, 2000.*

## 2000 WI App 119

(Also reported in 614 N.W.2d 512.)

†Petition to review denied.

On behalf of the defendant-appellant Antonio V. Blanco, the cause was submitted on the briefs of *Michael P. Jakus* of Elm Grove. There was oral argument by *Michael P. Jakus*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general and *Susan M. Crawford*, assistant attorney general. There was oral argument by *Christopher G. Wren*.

On behalf of the defendant-appellant Nora M. Al-Shammari, the cause was submitted on the briefs of *Linda Hornik* of Milwaukee. There was oral argument by *Linda Hornik*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general and *David H. Perlman*, assistant attorney general. There was oral argument by *David H. Perlman*.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

¶ 1. WEDEMEYER, P.J. Antonio V. Blanco and Nora M. Al-Shammari appeal from judgments entered after both pled guilty to possession with intent to deliver a controlled substance, marijuana, greater than 2,500 grams, as a party to a crime, contrary to WIS. STAT. §§ 961.14(4)(t), 961.41(1m)(h)3, 939.63 and

939.05 (1997–98).[1] Blanco and Al-Shammari claim that the trial court erred when it denied their motions seeking to suppress evidence. Each argues that the arrest warrant held by police did not give them proper authority to enter Al-Shammari's apartment and that, once the police had entered, the protective sweep doctrine did not authorize a search of a crawl space in the bathroom ceiling, which was secured by four screws. Because the police actions did not violate the appellants' constitutional rights, we affirm.

## I. BACKGROUND

¶ 2. On September 10, 1997, at approximately 7:15 p.m., Milwaukee Police Officer Diane Arenas, Wauwatosa Police Detective Keith Werner, and two other Milwaukee police officers arrived at an apartment building located at 2867 South Kinnickinnic Avenue in the City of Milwaukee. The officers believed that Blanco was staying in apartment #118 at that location. The officers had an arrest warrant for Blanco for the crime of attempted first-degree homicide, while armed. The officers did not directly proceed to the apartment where Blanco was believed to be, but conducted further investigation. An officer showed Blanco's picture to the apartment manager, who stated that Blanco might be staying in apartment #118. An occupant of the apartment building told an officer that Blanco had just been outside the apartment building smoking a cigarette before the police arrived. Another

---

[1] Blanco's conviction also included the "while armed" enhancer. On its own motion, this court orders Blanco's case, No. 98–3153–CR, and Al-Shammari's case, No. 98–3535–CR, consolidated for appeal dispositional purposes.

All references to the Wisconsin Statutes will be to the 1997–98 version unless otherwise noted.

occupant told the police that he had seen Blanco enter apartment #118 just before the police arrived.

¶ 3. At approximately 8:00 p.m., the officers knocked on the apartment door, announced that they were police officers, and that they were there to arrest Blanco, pursuant to a felony arrest warrant. A female, later identified as Al-Shammari, refused to allow the officers to enter. During this time period, another officer observed Blanco attempt to leave the apartment through a window. Blanco aborted the attempt, however, when he saw the police. The police called for assistance from the Tactical Enforcement Unit.

¶ 4. The immediate area was secured, surrounding apartments were evacuated, and the police were granted entry to an apartment immediately above and identical to the Al-Shammari apartment. As a result of this access and a review of the layout of the apartment, police were aware that there was a crawl space above the bathtub where someone could hide. Communications were repeatedly attempted with Al-Shammari to have Blanco turn himself over to the police. During this time, the police heard noises and activity coming from Al-Shammari's bathroom, including an inordinate amount of toilet flushing, and voices and sounds near the crawl space above the bathtub. The police also heard repeated use of the garbage disposal in Al-Shammari's kitchen. As a result, the water was turned off to the Al-Shammari apartment.

¶ 5. At approximately 10:30 p.m., after their unsuccessful efforts to have Al-Shammari consent to entry, or Blanco voluntarily submit to arrest, the six-man Tactical Enforcement Unit entered the apartment by use of a key obtained from the building manager. Officer Gilbert Carrasco was the first to enter. He held his shield in front of him in anticipation of some type of

resistant force. Upon entry, three individuals were located: Al-Shammari, Blanco, and Rogelio Fuentez. The three were handcuffed and taken into custody. Carrasco proceeded to the bathroom to perform a protective sweep of that room. He testified that he was concerned that someone may have been hiding in the crawl space located above the bathtub. The board covering the crawl space was secured to the ceiling with four screws. Carrasco asked another officer for a screwdriver and he then removed the panel. Upon doing so, a bag containing marijuana fell on his head. He checked the crawl space for suspects, but it was empty.

¶ 6. As a result of the discovery of the contraband, the police obtained a search warrant for the premises and discovered additional marijuana, a total of 20.4 pounds, scales, $1,745 in cash, three pagers, a cellular telephone, and a .380 caliber pistol. After being properly charged for the drug offenses, Blanco and Al-Shammari both filed motions seeking to suppress the evidence. The trial court conducted an evidentiary hearing and concluded that the entry into the apartment and the protective sweep were not inappropriate or unreasonable. Both Blanco and Al-Shammari pled guilty. Judgment was entered. Both now appeal.

## II. DISCUSSION

¶ 7. This case presents us with two questions: (1) whether the entry into Al-Shammari's apartment with only an arrest warrant for Blanco was lawful; and (2) whether the search of the crawl space above the bathtub was within the scope of a lawful protective sweep. The trial court answered both questions affirmatively, and denied Blanco's and Al-Shammari's motions seeking to suppress evidence discovered after the entry and the search.

¶ 8. Both issues implicate the Fourth Amendment of the United States Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, section 11, of the Wisconsin Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

"In reviewing an order suppressing evidence, this court will uphold a trial court's findings of fact unless they are [clearly erroneous]." *State v. Richardson*, 156 Wis. 2d 128, 137, 456 N.W.2d 830 (1990). "However, whether a seizure or search has occurred, and, if so, whether it passes statutory and constitutional muster are questions of law subject to de novo review." *Id.* at 137–38 (footnote omitted).

A. *Entry With Only Arrest Warrant.*

¶ 9. When the police officers entered the Al-Shammari apartment, they did not have a search warrant. They did, however, have an arrest warrant for Blanco. The warrant was for a charge of attempted

401

first-degree homicide, while armed. The address on the warrant, however, was not the Al-Shammari apartment, but rather was an address in Wauwatosa, which was believed to be Blanco's residence. Before coming to the Al-Shammari apartment, the police had also visited several other abodes where it was suspected that Blanco might be staying. They did not find him at any of the other addresses. Upon arrival at the Al-Shammari apartment building, the police engaged in further investigation to determine whether Blanco was now residing in the Al-Shammari apartment. The police were advised by the apartment manager that Blanco might be staying in the Al-Shammari apartment, although the apartment was leased only to Al-Shammari. The police discovered that Blanco had been seen in front of the apartment building smoking a cigarette shortly before the police arrived, and that Blanco was seen returning to the Al-Shammari apartment afterwards. The police also observed a friend of Blanco approach the apartment building, but then retreat after seeing the officers. Further, Blanco was positively identified within the apartment by one officer who saw him through the door jam, and another who saw him attempt to escape through a window.

¶ 10. An arrest warrant authorizes the police to "enter the suspect's residence to execute the warrant if there is reason to believe he will be found there; the officer does not need a search warrant." *United States v. Pallais*, 921 F.2d 684, 690 (7th Cir. 1990) (citing *Payton v. New York*, 445 U.S. 573, 603 (1980)). The question raised in the instant case, however, is whether the police had reason to believe that Blanco was residing in the Al-Shammari apartment. If so, this case is governed by *Payton*; if not, resolution rests on another line of cases, including *Steagald v. United*

*States*, 451 U.S. 204 (1981) and *State v. Kiper*, 193 Wis. 2d 69, 532 N.W.2d 698 (1995).

¶ 11. *Payton* authorizes police entry to a home if they have probable cause to believe that the person named in the arrest warrant lives there and is present within. *See id.*, 445 U.S. at 576. *Payton* held:

> If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

*Id.* at 602–03.

¶ 12. *Payton* has been construed to mean that police may enter the home of a person named in an arrest warrant, if the person resides there, even though third persons also reside there. *See United States v. Harper*, 928 F.2d 894, 896 (9th Cir. 1991). In the instant case, the State argues that *Payton* governs, that the police had probable cause to believe that Blanco both resided in, and was present in, the Al-Shammari apartment at the time entry was effected to execute the arrest warrant.

¶ 13. The other line of cases suggests that an arrest warrant is insufficient to enter a third party's home, even if the police believe that the subject of the arrest warrant is present there. In *Steagald*, the Supreme Court held that, absent consent or exigent circumstances, the police may not enter a third party's home to search for the subject of an arrest warrant. *See id.*, 451 U.S. at 205–06. Our Wisconsin Supreme Court

decided a similar case in *Kiper*, concluding that the police did not have probable cause to believe that the subject of the arrest warrant in that case was a resident of the Kiper home. *See id.*, 193 Wis. 2d at 83–84. Accordingly, the court applied the *Steagald* rationale and held that, absent Kiper's consent, exigent circumstances, or a search warrant, the police were not authorized to enter Kiper's home to search for the subject of the arrest warrant. *See Kiper*, 193 Wis. 2d at 87–89. In the instant case, Blanco and Al-Shammari argue that Blanco was not residing in the apartment, but was simply a guest and, therefore, under the *Steagald* line of cases, the police were required to obtain a search warrant before entering the apartment.

¶ 14. In *Valdez v. McPheters*, 172 F.3d 1220 (10th Cir. 1999), the federal appeals court reconciled the conclusions reached in *Payton* and *Steagald*, stating:

> *Payton* and *Steagald* cannot be understood to divide the world into residences belonging solely to the suspect on the one hand, and third parties on the other. The rule announced in *Payton* is applicable so long as the suspect "possesses common authority over, or some other significant relationship to," the residence entered by police. Thus, entry into a residence pursuant to an arrest warrant is permitted when "the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry."

*Id.* at 1225–26 (citations omitted).

¶ 15. The *Valdez* court also observed:

The majority of circuits which have addressed the issue have agreed that, under *Payton*, police officers entering a residence pursuant to an arrest warrant must demonstrate a reasonable belief that the arrestee lived in the residence, and a reasonable belief that the arrestee could be found within the residence at the time of the entry. *See United States v. Route*, 104 F.3d 59, 62 (5th Cir. [1997]) ("A valid arrest warrant carries with it the implicit but limited authority to enter the residence of the person named in the warrant in order to execute the warrant, where there is 'reason to believe' that the suspect is within"); *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996) ("officers executing an arrest warrant must have a 'reasonable belief that the suspect resides at the place to be entered . . . and [have] reason to believe that the suspect is present' at the time the warrant is executed"); *United States v. Lauter*, 57 F.3d 212, 215 (2nd Cir. 1995) ("the proper inquiry is whether there is a reasonable belief that the suspect resides at the place to be entered . . . and whether the officers have reason to believe that the suspect is present"); *United States v. Edmonds*, 52 F.3d 1236, 1248 (3d Cir. 1995) (although "the information available to the agents clearly did not exclude the possibility that [the suspect] was not in the apartment, the agents had reasonable grounds for concluding that he was there"), vacated in part on other grounds, 52 F.3d 1236, 1251 (3d Cir. 1995); *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. [1995]) ("the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry").

*Id.* at 1224 (subsequent history omitted). We agree with the reasoning espoused in *Valdez*. The dispositive issue then becomes whether the police have reasonable grounds to believe that the suspect of the search warrant was residing in the third party's home, or whether the information known to the police suggests merely that the suspect was visiting the third party's home. In *Kiper*, the reasonable facts suggested only that the subject of the arrest warrant was a visitor. There, the police entered the Kiper home knowing only that the suspect "had moved from the two addresses noted on the face of the arrest warrant, had no known present address, and . . . was present at Kiper's apartment six weeks earlier." *Id.*, 193 Wis. 2d at 84. Similarly, in *Steagald*, the police entered the third party's home based upon information that the subject of the warrant could be reached by telephone at that residence "during the next 24 hours." *Id.*, 451 U.S. at 206.

¶ 16. The facts that the police officers relied upon in the instant case led to the reasonable belief that Blanco was not merely a guest or visitor in Al-Shammari's home, but rather was residing there. Accordingly, this case is governed by *Payton*. *Payton* allows the police to enter a residence armed only with an arrest warrant if two factors are met: (1) the facts and circumstances present the police with a reasonable belief that the subject of the arrest warrant resides in the home; and (2) the facts and circumstances present the police with a reasonable belief that the subject of the arrest warrant is present in the home at the time entry is effected. *See id.*, 445 U.S. at 602–03.

¶ 17. During their investigation to locate Blanco, the police obtained the following information: (1) a tip that Blanco was "staying" at the apartment building; (2) confirmation from the building manager that

Blanco may be staying in the Al-Shammari apartment; (3) representation from an occupant of the building that Blanco had just been outside the apartment smoking a cigarette; (4) representation from an occupant of the building that Blanco returned to the Al-Shammari apartment after smoking his cigarette; and (5) evidence that Blanco was not at the Wauwatosa address or any other location investigated earlier that day by police. Further, the police observed individuals inside the Al-Shammari apartment moving furniture and other objects around the apartment, heard a great deal of noise coming from the bathroom, saw Blanco attempt to escape the apartment through the window, observed Blanco inside the apartment through the door jam, and observed a known friend of Blanco's approach the apartment.

¶ 18. Blanco contends that the significant distinction between "staying at" and "residing at" renders the officers' reliance on this information insufficient to enter the Al-Shammari apartment. We disagree. A similar argument was rejected in *Clayton v. City of Kingston*, 44 F. Supp. 2d 177 (N.D. N.Y. 1999), where the federal district court, relying on *United States v. Lovelock*, 170 F.3d 339, 344 (2d Cir. 1999), held that "the use of the word 'stays' is reasonably interpreted to mean that the suspect . . . *resided* or lived at" the residence, which was searched. *Clayton*, 44 F. Supp. 2d at 182 (emphasis added). We agree that in this context, "[t]he colloquial use" of *staying* is consistent with *residing*. *Lovelock*, 170 F.3d at 344; *see also United States v. Risse*, 83 F.3d 212, 216–17 (8th Cir. 1996) (stating that the phrases "staying with" and "living with" are suffi-

cient to support police officers' belief that the suspect resided at the location at issue).[2]

¶ 19. Thus, when the police officers were informed that Blanco was "staying" at the Al-Shammari apartment, it was reasonable for them to conclude that he was residing there. Given all of these factors, it was reasonable for the police to form a belief that Blanco was not merely visiting Al-Shammari. Rather, these facts support the reasonable conclusion that Blanco " 'possesse[d] common authority over, or some other significant relationship to,' " the apartment. *Valdez*, 172 F.3d at 1225–26 (citation omitted). Under the totality of the facts and circumstances, it was reasonable for the police to conclude that Blanco had made the Al-Shammari apartment his "dwelling" place and that he was residing there.[3]

¶ 20. Based on the foregoing, we conclude that the trial court's finding that Blanco was residing in the apartment was not clearly erroneous. We further conclude that, based on the same information set forth above, it was reasonable for the police to conclude that Blanco was present within the apartment when they entered. Accordingly, the two factors required by *Payton* were satisfied and, as a result, the arrest warrant provided the police with lawful authority to enter the

---

[2] This conclusion is consistent with practical experience, wherein the meaning of where one resides, lives, or stays has been blurred. *See generally* Charles B. Schudson, *Foreword*, 7 NOTRE DAME J. L. ETHICS & PUB. POL'Y 365 (1993).

[3] Although not dispositive of our decision in this case, we point out that Blanco's counsel admitted during the sentencing hearing that the Al-Shammari apartment was Blanco's "temporary residence."

Al-Shammari apartment to search for the subject of the arrest warrant, Blanco.

## B. *Protective Sweep.*

¶ 21. Blanco and Al-Shammari next claim that the search of the crawl space above the bathtub, conducted as part of a protective sweep, was unlawful. Blanco and Al-Shammari contend that the police used the protective sweep doctrine as a mere ruse or pretext in order to open the screwed-down access panel because the police suspected contraband was hidden in the crawl space. The State responds that the police officer who opened the panel testified that he went to the bathroom to conduct a protective sweep, that he opened the panel based on a belief that someone may have been hiding in the crawl space, and that he was not searching for contraband.

¶ 22. The trial court considered the information available at the time, including: (1) that Blanco's outstanding warrant was for attempted homicide while armed; (2) that the officers had heard a great deal of noise and activity coming from the bathroom; (3) the police officer's knowledge that the crawl space was big enough for a person to hide in; and (4) it appeared from the condition of the paint around the panel's screws that the panel had recently been removed. The trial court found that, based on these factors, it was reasonable for the police to believe a person might have been hiding in the crawl space. The trial court concluded that the search of the crawl space as a part of a protective sweep "was not inappropriate and was not unreasonable under the law and circumstances."

¶ 23. In *Maryland v. Buie*, 494 U.S. 325 (1990), the United States Supreme Court held that officers may conduct a limited protective sweep of a home, fol-

lowing an in-home arrest, if they have "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. The " 'protective sweep' is a quick and limited search of [a] premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. The sweep must also be limited in duration, lasting "no longer than is necessary to dispel the reasonable suspicion of danger." *Id.* The Supreme Court held that, during an arrest, officers may "without probable cause or reasonable suspicion[ ] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. Beyond that limited cursory inspection, however, an officer must have articulable facts that support an inference that the area to be swept harbors an individual posing danger to those present. *See id.*

¶ 24. In applying the protective sweep doctrine, and what constitutes a "cursory visual inspection of those places in which a person might be hiding," courts look at the individual facts available to the police at the time the action is taken. *See United States v. Burrows*, 48 F.3d 1011, 1016–18 (7th Cir. 1995). In *Burrows*, the seventh circuit upheld a protective sweep where the police forced open four locked doors, in a two-story apartment. *See id.* at 1017. The court determined "that the officers had the right to ensure their safety." *Id.* As evidenced by this case, there may be situations in which a *secured* place may be subjected to a cursory search.

¶ 25. The question in the instant case then becomes whether the search of the crawl space above

the bathtub was proper under the protective sweep doctrine. Blanco and Al-Shammari point out that the panel had four screws in it fastening it to the ceiling and that the police officer needed to use a screwdriver to remove the screws before he could open the panel. They argue that there is no testimony that he had his gun drawn, or had the assistance of other officers in the bathroom, as he should have, if he truly believed that someone was hiding in the crawl space. They contend that removal of the panel above the bathtub, under the pretext of "sweeping" the area for a person, was simply a ruse to discover suspected contraband.

¶ 26. The facts argued by Blanco and Al-Shammari do not fall on deaf ears. In hindsight, the actions of the officer may raise an eyebrow, particularly given the fact that the panel was screwed into the ceiling and, as it turned out, no other person was hiding in the crawl space. However, each situation must be examined by the facts and circumstances confronted by the police at the time the sweep was conducted.

¶ 27. The officers in this case were brought to a scene where an individual was wanted on a charge of attempted first-degree homicide, while armed. Certainly, the potential for an explosive and dangerous situation existed. The police officers were refused entry and Blanco refused to come out of the apartment for over three hours. The Tactical Enforcement Unit, called in to assist, entered the apartment with ballistic shields drawn. Although the suspects did not resist arrest once the officers had gained entry, that did not preclude the possibility that another person might be hiding in the apartment. Our task is to examine all the facts and circumstances and to determine whether the police officer's conduct was reasonable, given the milieu of danger in which he was discharging his pro-

fessional responsibility. Reasonably, a protective sweep is not a series of slides, any one of which can be isolated and then examined with the precision of an academic scalpel. Rather, it is a continuum of action, and sometimes reaction, requiring split-second decisions that ought be examined only under the microscope of reasonableness.

¶ 28. Here, under all the facts and circumstances, the officer's action in "sweeping" the crawl space was reasonable. In addition to the facts noted above, the police were also operating with the following relevant information: (1) during surveillance of the apartment, the police were able to view an apartment with an identical layout; (2) the police knew from this that there was a crawl space above the bathtub, which was two feet by five feet, a space sufficiently large enough to hide a person; (3) the police had heard an inordinate amount of noise and activity coming from the bathroom near the crawl space, leading them to suspect that someone might be in the crawl space attempting to break through the floor into the apartment above; (4) upon entry into the bathroom, Officer Carrasco observed that the paint around the screws holding the access panel of the crawl space to the ceiling had been tampered with, revealing that the panel had recently been removed.

¶ 29. In addition, we note that the police did not come into the apartment and start rummaging around looking for contraband. No other closet, drawer, cupboard or area was swept. The police swept only the area in which they had reason to believe that a person might be hiding. These facts dispel Blanco's and Al-Shammari's contention that the police were not checking the crawl space for persons, but were actually looking for

illegal drugs. Moreover, even if a suspicion of contraband was created during the surveillance because of the inordinate amount of flushing and excessive use of the garbage disposal, such does not trump the police officers' actions in sweeping the area for persons. When a police officer is confronted with two reasonable competing inferences, one that would justify the search and another that would not, the officer is entitled to rely on the reasonable inference justifying the search. *See State v. Tompkins*, 144 Wis. 2d 116, 125, 423 N.W.2d 823 (1988). Under the totality of the facts and circumstances, we conclude that the protective sweep of the crawl space was reasonable. Accordingly, we affirm the trial court's decision to deny the motions to suppress.[4]

*By the Court.*—Judgments affirmed.

¶ 30. CURLEY, J. *(dissenting).* I am in agreement with the majority's analysis and conclusion that, under the circumstances present here, the police, armed with an arrest warrant for Antonio Blanco, lawfully entered Al-Shammari's apartment and arrested Blanco. I do not, however, agree with the majority's decision that the police officer's actions in searching a secured crawl space were reasonable or lawful under the protective sweep doctrine.

---

[4] We acknowledge that the theory suggested in the dissent certainly is plausible. However, based upon the testimony of the officer and the surrounding facts and circumstances, it is not the only plausible theory. In ruling that the protective sweep was constitutional, the trial court inherently judged the credibility of the police officer's testimony provided in support of the protective sweep. Because the facts and circumstances available to the police at the time the sweep was conducted support the police officer's actions, we cannot discredit the plausibility of the valid purpose supporting the protective sweep.

¶ 31. First, I do not believe that the officer was actually conducting a protective sweep. A review of the officer's actions permits only one reasonable conclusion—that the officer was searching for illicit drugs in the crawl space, and not, as he claimed, conducting a search for an accomplice of the three persons found in the apartment. I reach this decision by noting that the officer went immediately to the bathroom, bypassing several other larger rooms on his way in which he conducted no protective sweeps. Further, as the majority opinion concedes, the record is devoid of any evidence that the police officer, when entering the bathroom, had his gun drawn, or requested the assistance of any other officers, actions one would ordinarily expect when a police officer suspects an accomplice is hidden in a room. These facts, coupled with the earlier police observations concerning the apartment lead me to believe no protective sweep was taking place.

¶ 32. After many hours of monitoring Al-Shammari's apartment, the police observed only three people in the apartment. All three were immediately accounted for when the police entered the apartment. Thus, when the police entered Al-Shammari's apartment and observed three people, they had no reasonable suspicion that another person was in the apartment. The police did, however, have a reasonable belief that drugs were being disposed of by means of the toilet and the garbage disposal. The police reported hearing excessive flushing of the toilet and constant running of the garbage disposal. So strong were their suspicions that drugs were being removed from the apartment in this manner that the police had the water turned off. Thus, while it was reasonable for the police to believe that the suspects were disposing of contraband, these same observations did not transform their

suspicion of drug disposal into a reasonable belief that a person was hiding in the crawl space. Consequently, I believe no reasonable officer had any facts, much less facts which meet the "specific and articulable facts" test required under *Maryland v. Buie*, 494 U.S. 325 (1990), to believe that the bathroom or, for that matter, the apartment, contained a dangerous person who posed a danger to him.

¶ 33. The facts in *United States v. Burrows*, 48 F.3d 1011 (7th Cir. 1995), a case affirming a protective sweep, cited in the majority opinion, are much different. In *Burrows*, the Court held that the police could forcibly open the locked doors of several rooms. *See id.* at 1016–17. There, however, the police entering the apartment had absolutely no idea how many people were in the apartment. Here, the police knew, after hours of observation, that there were only three suspects. Thus, I must conclude that the claimed protective sweep for dangerous accomplices was actually a pretext for the unauthorized search of the apartment for contraband.

¶ 34. Second, even if one accepts the premise that the police were engaged in a protective sweep, the actions taken by the officer went far beyond those permitted under law. Assuming that the officer had a specific and articulable belief that someone might be hiding, his protective sweep was, nevertheless, limited in its scope. A protective sweep "is not a full search of the premises." *Buie*, 494 U.S. at 335. Rather, it is a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. The protective sweep doctrine is "aimed at protecting the arresting officers," *id.*

at 335, and the doctrine limits officers to "look in closets and other spaces *immediately* adjoining the place of arrest from which an attack could be *immediately* launched," *id.* at 334 (emphases added).

¶ 35. None of the underpinnings for a constitutionally protected protective sweep existed here for the search of the crawl space. First, the bathroom did not adjoin the place of arrest. In fact, as noted, the officer had to travel past several rooms before reaching the bathroom. In *State v. Kruse*, 175 Wis. 2d 89, 499 N.W.2d 185 (Ct. App. 1993), a case with facts more supportive of a protective sweep than those found here, this court upheld the trial court's suppression of marijuana found in Kruse's bedroom closet during a protective sweep after Kruse was arrested in the living room. In doing so, this court stated: "We conclude that the bedroom closet was not in the vicinity of the place of arrest and therefore not subject to a *Buie* protective search without reasonable suspicion." *Id.* at 95.

¶ 36. Second, given the limited purpose of the sweep—to protect officers—no reasonable officer could believe that a person, if indeed there was one, hidden behind a trapdoor securely fastened with four screws would pose a danger to the officers or possibly launch an *immediate* attack. In *Burrows*, the locked doors that were forcibly opened "were in an area adjoining the place of arrest [the bathroom] from which an attack could be immediately launched." *Burrows*, 48 F.3d at 1014. A locked door can be easily unlocked from the inside, but here, it would be most difficult and time consuming for a person to exit from a crawl space whose opening has been secured by four screws on the outside. Also, a "cursory visual inspection" hardly encompasses entering a secured space with the aid of tools.

¶ 37. Consequently, I believe the actions taken by the police fell outside those permitted under the protective sweep doctrine. Further, by legitimizing the search of a crawl space accessed only by means of removing the door's four screws with a screwdriver, the majority has enlarged the protective sweep exception far beyond that contemplated by the United States Supreme Court and, in doing so, has dealt a serious blow to the Fourth Amendment prohibition against unreasonable searches.