[No. 31544-1-II.   Division Two.   May 23, 2006.]

The State of Washington, *Respondent*, v. Raymond Kamiolani Hatchie, *Appellant*.

*Kathryn A. Russell Selk* (of *Russell Selk Law Office*), for appellant.

*Gerald A. Horne, Prosecuting Attorney,* and *Michelle Luna-Green, Deputy,* for respondent.

¶1 QUINN-BRINTNALL, C.J. — Officers entered Raymond Hatchie's home to arrest Eric Schinnell on a misdemeanor warrant. At the time of entry, the officers had probable cause to believe that Schinnell lived in Hatchie's home and that Schinnell was present. While inside, the officers discovered evidence of methamphetamine manufacture. The officers then obtained a search warrant for Hatchie's home. That search warrant eventually led to Hatchie's conviction for unlawful manufacture of a controlled substance.

¶2 This appeal presents two significant questions: First, does article I, section 7 of the Washington Constitution permit law enforcement to enter a suspect's residence to serve a misdemeanor arrest warrant? Second, is a defendant entitled to a new sentencing hearing when he is given an opportunity to allocute after the court has orally pronounced its sentence? We answer the first question yes and the second no and affirm Hatchie's conviction and sentence.[1]

## FACTS

¶3 On June 11, 2003, Pierce County Sheriff's Deputies were watching a Tacoma hardware store for purchases of methamphetamine precursors when they saw Schinnell buy a container of muriatic acid. The deputies followed Schinnell and observed him purchasing lithium batteries in a second store and two bottles of lye in a third store. Muriatic acid, lithium batteries, and lye are all used in methamphetamine manufacturing.

¶4 The deputies continued to follow Schinnell at a distance in an unmarked car. A check with the Department of Licensing revealed that Schinnell's driver's license was suspended. It also revealed that he had an outstanding misdemeanor warrant for failing to appear for sentencing on a conviction for third degree driving while license suspended. The warrant provided for a $500 cash-only bail.

¶5 The deputies decided to pull Schinnell over at this point, but they lost sight of him once he drove into a

---

[1] We address Hatchie's additional assignments of error in the unpublished portion of this opinion. Our resolution of those issues does not alter the result.

residential area. The deputies eventually saw Schinnell's truck parked in the driveway of a duplex unit. Schinnell was standing next to a fifth-wheel trailer in the driveway. Parked in the yard of the unit was a second car registered to Schinnell. Schinnell's vehicles were registered to a different address in Hoodsport, Washington; Schinnell's misdemeanor warrant also listed that same Hoodsport address. The deputies established surveillance and called for a uniformed unit in a marked patrol car to contact Schinnell.

¶6 When the uniformed squad arrived, the deputies interviewed two people who were neighbors of the duplex unit. One neighbor stated that Schinnell lived at the unit and that he had been there earlier that day. The other neighbor, John Huntsman, told the deputies that there was a lot of traffic to the unit at all hours of the day. Huntsman said that people would often show up at his home looking for drugs and when he turned them away they would head to the unit. Huntsman also stated that as many as six people lived at the unit and that he had seen Schinnell and his truck there before.

¶7 After talking with the neighbors, the deputies decided to contact Schinnell, who by that time was no longer standing in front of the duplex unit. As the deputies approached the unit, they spoke with Timothy Petticord, who was standing in the unit's yard. Petticord told the deputies that if Schinnell's truck was there, he was in the unit. Petticord also stated that he (Petticord) "stayed at the residence but generally outside the residence." 1 Verbatim Report of Proceedings: Trial (VRPT) (Dec. 4, 2003) at 179.

¶8 The deputies knocked intermittently on the duplex unit door for 45 minutes before Donald Robbins answered. When asked, Robbins first said that Schinnell was inside. He then stated that he had been sleeping and that he assumed Schinnell was "home" because his truck was there. 1 VRPT (Dec. 4, 2003) at 28. The deputies announced their presence and asked Schinnell to come out. When there was no response, the deputies decided to enter the unit to serve the arrest warrant on Schinnell and to talk to him about his question-

able purchases. While looking for Schinnell in the unit, the deputies saw numerous items used to manufacture methamphetamine. The deputies eventually found Schinnell hiding under a truck in the garage. They arrested him on the outstanding arrest warrant.

¶9 After Schinnell's arrest, the deputies learned that the duplex unit was being rented by Hatchie. Robbins told the deputies that Hatchie was at work. Robbins indicated that he had been living with Hatchie for three months. Robbins also stated that Schinnell had been staying at the unit off and on for the last two months.

¶10 The deputies obtained a warrant to search Hatchie's duplex unit for evidence of possession and manufacture of methamphetamine. Based on the evidence seized from the unit, the State charged Hatchie with unlawful manufacture of a controlled substance. *See* former RCW 69.50.401 (1998).

¶11 Hatchie moved to suppress the evidence seized under the search warrant. Hatchie maintained that the deputies could not enter his home to arrest Schinnell on the outstanding misdemeanor warrant and that, even if they could, the arrest warrant was invalid because it provided for a cash-only bail. Hatchie also maintained that the deputies used Schinnell's warrant as a pretext to enter his home. The trial court denied Hatchie's suppression motion.

¶12 A jury found Hatchie guilty as charged. At sentencing, the prosecutor recommended that the court sentence Hatchie to the high end of his 51- to 68-month standard sentencing range. Defense counsel requested an exceptional sentence downward. The court then indicated that it was "ready to rule" and that it would impose a 55-month sentence "unless your client has something else to add or say . . . on his own behalf." Verbatim Report of Proceedings: Sentencing (VRPS) (Mar. 12, 2004) at 19. Hatchie and defense counsel did not respond.

¶13 When the court began explaining the reasons for its sentence, the prosecutor interjected: "Your Honor, I think probably before you make a final ruling on sentence, we

should ask formally whether Mr. Hatchie wishes to allocute." VRPS (Mar. 12, 2004) at 19-20. Defense counsel responded that allocution would be pointless because the court had already ruled. The court then stated: "If he has something to say that you have not said, that I don't know about, I will consider it." VRPS (Mar. 12, 2004) at 20. Hatchie then addressed the court. After hearing from Hatchie, the court imposed a sentence of 53 months.

¶14 This appeal followed.

## ANALYSIS

### Misdemeanor Arrest Warrants and Home Entry

¶15 Hatchie contends that under the Fourth Amendment and article I, section 7 of the Washington Constitution, law enforcement could not enter his home to serve a misdemeanor arrest warrant on Schinnell. Alternatively, he maintains that even if home entry to serve a misdemeanor arrest warrant is permissible, Schinnell's warrant was invalid because it provided for a cash-only bail. We disagree with both contentions.

¶16 Two constitutional interests are implicated when law enforcement enters a home to serve an arrest warrant: the arrestee's interest in being free from an unreasonable seizure and the resident's interest in the privacy of his home. *Steagald v. United States*, 451 U.S. 204, 216, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981); *State v. Young*, 123 Wn.2d 173, 185, 867 P.2d 593 (1994). Here, the arrestee and the resident are different people with different interests at stake. The arrestee's liberty interest is protected by the requirement that the arrest warrant be issued by a neutral and detached magistrate upon a showing of probable cause. *State v. Williams*, 142 Wn.2d 17, 24 n.2, 11 P.3d 714 (2000). Schinnell's interest, as the arrestee, is not at issue in this appeal; we are concerned only with Hatchie's interest as a resident of the home which police entered to arrest Schinnell. If the entry to arrest Schinnell was unlawful, then Hatchie's rights were violated by the admission of

evidence obtained as a result of the search warrant that was based on information obtained during that unlawful entry. *See State v. Ladson*, 138 Wn.2d 343, 359, 979 P.2d 833 (1999). If the entry was lawful, then Hatchie's rights were not violated by the admission of the evidence because it was seized pursuant to a search warrant that was based on the officer's plain view observations from inside the home made when they lawfully entered to arrest Schinnell. *State v. Kull*, 155 Wn.2d 80, 85, 118 P.3d 307 (2005).

¶17 The Fourth Amendment prohibits unreasonable searches. Article I, section 7 of the Washington Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Under both constitutional provisions, lawful searches generally require search warrants. *Ladson*, 138 Wn.2d at 349. There are, however, several exceptions that " 'provide for those cases where the societal costs of obtaining a warrant . . . outweigh the *reasons* for prior recourse to a neutral magistrate.' " *Ladson*, 138 Wn.2d at 349 (alteration in original) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996)). The exceptions include consent, exigent circumstances, plain view, inventory searches, investigatory *Terry*[2] stops, and searches incident to a valid arrest. *Hendrickson*, 129 Wn.2d at 71. In Washington, these search warrant exceptions are " 'jealously and carefully drawn' " because article I, section 7 provides greater privacy protections than its federal counterpart. *Ladson*, 138 Wn.2d at 349 (quoting *Hendrickson*, 129 Wn.2d at 70). Article I, section 7 recognizes that "[i]n no area is a citizen more entitled to his privacy than in his or her home." *Young*, 123 Wn.2d at 185.

¶18 In *Payton v. New York*, 445 U.S. 573, 576, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), the United States Supreme Court held that absent exigent circumstances, the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order

---

[2] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

to make a routine felony arrest." In narrowing the scope of its holding, the Court rejected the contention that "only a search warrant based on probable cause to believe the suspect is at home at a given time can adequately protect the privacy interests at stake":

> It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

*Payton*, 445 U.S. at 602-03. *Payton*'s holding is limited to cases where law enforcement enters a home to arrest a person they believe to be a resident; the Court held one year later in *Steagald*, 451 U.S. at 213, that entry was not permissible to arrest a person believed to be a guest.

¶19 The Washington Supreme Court applied *Payton* in *Williams*, 142 Wn.2d 17, and *State v. Vy Thang*, 145 Wn.2d 630, 41 P.3d 1159 (2002). In both cases, officers entered homes with the resident's consent to arrest a guest on an outstanding felony warrant. The court concluded both times that the consent was voluntary and the entry was therefore lawful. *Vy Thang*, 145 Wn.2d at 637-39; *Williams*, 142 Wn.2d at 27-28. In dictum, both courts also concluded that the entry was lawful under *Payton* because officers could have entered the arrestee's home to effectuate the arrest and a person for whom an arrest warrant has been issued is not entitled to additional privacy protections in a host's home. *Vy Thang*, 145 Wn.2d at 638-39; *Williams*, 142 Wn.2d at 23-24. In neither case did the court discuss whether the search warrant exception for arrest warrants applied under article I, section 7, or whether the exception

depended on the seriousness of the crime for which the warrant was issued.

¶20 Those courts directly addressing *Payton* have held that its rule applies with equal force to misdemeanor warrants.[3] These courts have concluded that the felony/misdemeanor distinction is irrelevant because *Payton*'s main focus is the necessity of a magistrate's probable cause finding as a restraint on law enforcement's ability to enter a home for purposes of making an arrest. *See, e.g., United States v. Spencer*, 684 F.2d 220, 223-24 (2d Cir. 1982), *cert. denied*, 459 U.S. 1109 (1983); *State v. Coma*, 133 Idaho 29, 31-32, 981 P.2d 754 (Ct. App. 1999). Such decisions are supported by the United States Supreme Court's later discussion of *Payton* in *Steagald*: "Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." 451 U.S. at 214 n.7. *See also Welsh v. Wisconsin*, 466 U.S. 740, 750 & n.11, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984) (in a case where the officer entered a home without an arrest or search warrant, the Court noted that *Payton* was "expressly limited to felony arrests," but also stated that "[w]hen the government's interest is only to arrest for a minor offense," and the government seeks to enter the home to effectuate the arrest, "the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate").

¶21 The cases interpreting *Payton* delineate the protections provided by the Fourth Amendment and, as such, are of little value in addressing the broader privacy protections afforded under Washington's article I, section 7. Thus, we

---

[3] *United States v. Clayton*, 210 F.3d 841, 843 (8th Cir. 2000); *United States v. Spencer*, 684 F.2d 220, 222-24 (2d Cir. 1982), *cert. denied*, 459 U.S. 1109 (1983); *United States v. Meindl*, 83 F. Supp. 2d 1207, 1214-15 (D. Kan. 1999); *Smith v. Tolley*, 960 F. Supp. 977, 990-91 (E.D. Va. 1997); *People v. LeBlanc*, 60 Cal. App. 4th 157, 164, 70 Cal. Rptr. 2d 195 (1997); *State v. Coma*, 133 Idaho 29, 31-32, 981 P.2d 754 (Ct. App. 1999); *Green v. State*, 78 S.W.3d 604, 611 (Tex. App. 2002); *Archer v. Commonwealth*, 26 Va. App. 1, 10-11, 492 S.E.2d 826 (1997).

must determine whether *Payton* is good law in Washington and, if so, whether the Washington Constitution distinguishes between felony and misdemeanor warrants. Hatchie maintains that *State v. Chrisman*, 100 Wn.2d 814, 676 P.2d 419 (1984) (*Chrisman* II), controls this inquiry. We disagree.

¶22 In *Chrisman*, a college student was arrested for possessing alcohol when he appeared to be a minor. The student told the officer that he had identification in his dorm room, and the officer accompanied him to retrieve it. From his vantage point in the dorm hallway, the officer noticed what appeared to be marijuana seeds and a smoking pipe inside the dorm room. The officer entered the room to investigate, and his suspicions were confirmed.

¶23 The Washington Supreme Court held that the officer's warrantless, nonconsensual entry into the dorm room violated the Fourth Amendment. *State v. Chrisman*, 94 Wn.2d 711, 717-18, 619 P.2d 971 (1980). The United States Supreme Court reversed, concluding that the entry was lawful because, under the Fourth Amendment, an officer has the "right to remain literally at [an arrestee's] elbow at all times." *Washington v. Chrisman*, 455 U.S. 1, 6, 102 S. Ct. 812, 70 L. Ed. 2d 778 (1982). On remand, the Washington Supreme Court held that the officer's entry violated article I, section 7:

> [T]he officer's warrantless entry into the dormitory room, following the misdemeanor arrest, was not permitted because the officer was not presented with facts sufficient to demonstrate (1) a threat to the officer's safety, or (2) the possibility of destruction of evidence of the misdemeanor charged, or (3) a strong likelihood of escape. . . . The heightened protection afforded state citizens against unlawful intrusion into private dwellings places an onerous burden upon the government to show a compelling need to act outside of our warrant requirement. In cases of minor violations, where no danger exists, and where there is no threat of destruction of the evidence, we can find no compelling need to enter a private residence.

*Chrisman* II, 100 Wn.2d at 821-22.

¶24 *Chrisman* II was applied in *Kull*, 155 Wn.2d 80. There, officers entered an apartment building to arrest Kull on a misdemeanor warrant. Before reaching Kull's apartment, the officers noticed Kull in the community laundry room. Kull was arrested but informed that she could avoid being booked into jail if she posted the value of the warrant. Kull then went to her apartment and instructed a friend to retrieve her purse from her bedroom. When an officer followed the friend into Kull's bedroom, he saw a baggie of cocaine. The officer then seized Kull's purse and found methamphetamine inside.

¶25 Citing *Chrisman* II, Kull moved to suppress the evidence found in her apartment. The trial court denied the motion, finding that the officer had a legitimate safety concern in following the friend into Kull's bedroom. The Washington Supreme Court reversed, finding no support for the trial court's finding of exigent circumstances. *Kull*, 155 Wn.2d at 87-89.

¶26 *Chrisman* II and *Kull* do not apply here because, in both cases, the arrest occurred before the police entered into the dwelling. The officers in *Kull* lost any authority that they had to enter Kull's apartment to make an arrest under the arrest warrant when they arrested her in the community laundry room. *See Wilson v. Layne*, 526 U.S. 603, 611, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) ("[T]he Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion."). The same analysis applies to *Chrisman* II, with the added distinction being that due to the absence of a warrant, there was no shield between the officer and the resident's privacy interests.

¶27 Because the officers in *Chrisman* II and *Kull* lacked any authority to enter the dwellings to serve arrest warrants, lawful entry required proof of an exception to the search warrant requirement. The pertinent exceptions in this situation include consent and exigent circumstances, with the latter including the officer's safety, destruction of evidence, and likelihood of escape subexceptions discussed

in *Chrisman* II and *Kull*. *See Hendrickson*, 129 Wn.2d at 71; *State v. Counts*, 99 Wn.2d 54, 60, 659 P.2d 1087 (1983); *see also State v. Nelson*, 47 Wn. App. 157, 162-64, 734 P.2d 516 (1987) (where officers had a misdemeanor warrant and made the arrest outside the home, officers lawfully entered the home due to the arrestee's consent). *Chrisman* II and *Kull* represent two propositions: First, a continuation of precedent applying the search warrant exceptions. And second, a refusal to apply in Washington the Fourth Amendment's warrant exception allowing law enforcement the "right to remain literally at [an arrestee's] elbow at all times." *Chrisman*, 455 U.S. at 6. But *Chrisman* II and *Kull* do not, as Hatchie contends, distinguish between felony and misdemeanor warrants for purposes of authorizing home entry to effectuate the arrest.[4]

■ ■ ¶28 We turn now to whether the *Payton* rule applies under article I, section 7, and if so, whether a distinction must be made between felony and misdemeanor warrants. The protections of article I, section 7 extend to " 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.' " *Young*, 123 Wn.2d at 181 (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)); *accord Ladson*, 138 Wn.2d at 349. Our inquiry into *Payton*'s application requires a balancing of "societal need"

---

[4] This does not mean the felony/misdemeanor distinction played no role in *Chrisman* II. The seriousness of the crime will heighten the burden placed on the government to show that an exception to the warrant requirement applies. *Chrisman* II, 100 Wn.2d at 822. This is particularly true when the government seeks to invoke the exigent circumstance exception. *Welsh*, 466 U.S. at 753 ("[A]n important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made."). The *Chrisman* II court simply concluded that the exigency threshold had not been met under the facts presented. Here, we are not dealing with the exigent circumstances exception. Thus, *Chrisman* II does not control.

Hatchie contends that Division Three has held to the contrary. In *State v. Anderson*, 105 Wn. App. 223, 231, 19 P.3d 1094 (2001), and *State v. McKinney*, 49 Wn. App. 850, 857, 746 P.2d 835 (1987), the court did cite *Chrisman* II for the proposition that police need a "strong justification" for entering a residence on a misdemeanor warrant. But these statements were without analysis and are dictum in both cases. *Anderson*, 105 Wn. App. at 231-32 (officer entered home without any evidence that arrestee resided there); *McKinney*, 49 Wn. App. at 857-58 (officers lawfully entered home in hot pursuit of the arrestee).

with the "privacy interests provided by article [I], section 7." *State v. Patterson*, 112 Wn.2d 731, 735, 774 P.2d 10 (1989).

¶29 "[A] person's home is a highly private place," subject to rigorous constitutional protection. *Kull*, 155 Wn.2d at 84; *Young*, 123 Wn.2d at 185. Absent a search warrant, any governmental entry into a home raises serious privacy concerns. But once a neutral magistrate has issued an arrest warrant, probable cause exists to believe that a citizen has violated the law of the land and the citizen's privacy concerns are outweighed by society's interests in requiring him to answer those charges. The framers of the state constitution in 1889 did not intend that a person's home be an inviolate sanctuary unbreachable by law enforcement armed with a lawful warrant for the resident's arrest. We believe that article I, section 7, like the Fourth Amendment, recognizes that "[b]ecause an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." *Steagald*, 451 U.S. at 214 n.7.

¶30 The privacy concerns implicated by our holding are best addressed by narrowly drawing the scope of the search warrant exception rather than creating a distinction between misdemeanor and felony arrest warrants. We emphasize that if law enforcement uses an arrest warrant as a pretext for entering the resident's home to conduct an otherwise impermissible search, the entry will be unlawful. *Ladson*, 138 Wn.2d at 358; *see also United States v. Albrektsen*, 151 F.3d 951, 954 (9th Cir. 1998) (rejecting argument that misdemeanor warrants permitted entry where arrest could have occurred at the front door but the officer entered to search for drugs). In addition, we hold that lawful entry into a dwelling to serve an arrest warrant requires that law enforcement have probable cause to believe (1) that the person named in the arrest warrant resides in the home to be entered and (2) the arrestee is in

the home at the time of entry.[5] Probable cause exists when the facts and circumstances within the arresting officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the beliefs. *State v. Graham*, 130 Wn.2d 711, 724, 927 P.2d 227 (1996).

¶31 We hold that under article I, section 7, a felony or misdemeanor arrest warrant carries with it the limited authority to enter a dwelling to serve the warrant if there is probable cause to believe that the arrestee resides there and is present at the time law enforcement seeks to enter the dwelling.[6] Applying our holding to the facts of this case,

---

[5] We believe these heightened standards are required under article I, section 7. We note, however, a split of authority on the standards necessary under the Fourth Amendment. The majority of courts hold that officers need have only a reasonable belief that the arrestee resides in and is currently present at the dwelling to be searched. *See United States v. Gay*, 240 F.3d 1222, 1226 (10th Cir.), *cert. denied*, 533 U.S. 939 (2001); *United States v. Lovelock*, 170 F.3d 339, 343 (2d Cir.), *cert. denied*, 528 U.S. 853 (1999); *United States v. Route*, 104 F.3d 59, 62 (5th Cir.), *cert. denied*, 521 U.S. 1109 (1997); *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996); *United States v. May*, 68 F.3d 515, 516 (D.C. Cir. 1995); *United States v. Magluta*, 44 F.3d 1530, 1534-35 (11th Cir.), *cert. denied*, 516 U.S. 869 (1995); *People v. Aarness*, 116 P.3d 1233, 1237-38 (Colo. Ct. App. 2005); *Dockery v. United States*, 853 A.2d 687, 694 (D.C. 2004); *Commonwealth v. Silva*, 440 Mass. 772, 776-78, 802 N.E.2d 535 (2004) (applying state constitution); *Green*, 78 S.W.3d at 610-12; *State v. Blanco*, 2000 WI App 119, ¶¶ 13-15, 237 Wis. 2d 395, 614 N.W.2d 512, *review denied*, 2000 WI 121. A minority of courts hold that probable cause is required. *See United States v. Gorman*, 314 F.3d 1105, 1111-13 (9th Cir. 2002); *State v. Smith*, 208 Ariz. 20, 23, 90 P.3d 221 (Ct. App. 2004); *State v. Jones*, 332 Or. 284, 27 P.3d 119 (2001) (applying state constitution); *see also* 3 WAYNE R. LAFAVE, SEARCH & SEIZURE § 6.1(a), at 265-67 (4th ed. 2004) (opining that probable cause is required). As the Arizona Court of Appeals has noted, however, the split of authority may be more a matter of semantics than substance:

Those courts that have distinguished reasonable belief from probable cause have done so not because those standards require differing levels of certainty necessary to justify a police action. Rather, they have done so because "probable cause" has become a term of art and has traditionally engendered a need for an additional magisterial finding to authorize police action.

*Smith*, 208 Ariz. at 24.

[6] Because our holding discusses the authority inherent in an arrest warrant and the safeguards necessary to protect a resident's interests in his home, it is of limited applicability when the party challenging the entry is a nonresident. *See Minnesota v. Olson*, 495 U.S. 91, 95-97, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990) (holding that only a person with a reasonable expectation of privacy in a residence may complain that an entry into the residence was unlawful); *United States v. Agnew*, 407 F.3d 193, 196-97 (3d Cir. 2005); *Vy Thang*, 145 Wn.2d at 638-39; *Williams*, 142 Wn.2d at 27-28.

the deputies lawfully entered Hatchie's home to arrest Schinnell on the outstanding arrest warrant.

¶32 Here, the deputies had a warrant for Schinnell's arrest. Hatchie does not contend that the deputies lacked probable cause to believe that Schinnell was inside the unit at the time they entered it. Nor does Hatchie contend, as he did below, that the deputies used Schinnell's warrant as a pretext for entering the unit.[7] Rather, Hatchie argues that the deputies lacked probable cause to believe that Schinnell resided at the unit. We disagree.

¶33 A neighbor told the deputies that Schinnell lived at the duplex unit. They had also been told by three people—a neighbor and two individuals associated with the unit— that if Schinnell's truck was at the unit, he would be inside. Robbins, who answered the door, specifically stated that Schinnell would be "home" if his truck was there. 1 VRPT (Dec. 4, 2003) at 28. Schinnell also had two of his trucks at the residence, one parked on the lawn; the presence of multiple vehicles, parked in irregular locations, suggests that the vehicles' owner is not a mere guest in the home.

¶34 Hatchie relies on the fact that Schinnell's arrest warrant and vehicle registration listed a different address in Hoodsport, Washington. But individuals frequently change their residence without updating Department of Licensing records as they are legally required to do. RCW 46-.20.205(1); *Pascua v. Heil*, 126 Wn. App. 520, 531, 108 P.3d 1253 (2005). And it is certainly not surprising that an individual with outstanding warrants will fail to inform the government of his current residence. Moreover, probable cause does not require absolute certainty; it requires only facts and circumstances sufficient to form a reasonable conclusion that the person named in the warrant resides and is present in the residence to be entered. *See Graham*, 130 Wn.2d at 724. The totality of the facts known to the

---

[7] Hatchie does give this issue vague and passing mention in his briefing. But it is insufficient to warrant our consideration. *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004).

deputies who followed Schinnell established probable cause to believe that Schinnell resided in the duplex unit.[8]

¶35 Hatchie lastly argues that even if home entry to serve a misdemeanor warrant is generally permissible, it was not in this case because Schinnell's warrant was invalid due to the cash-only bail provision. Hatchie is correct that under article I, section 7, Schinnell's arrest warrant authorized law enforcement to enter the duplex unit only if the warrant was valid. *State v. Lansden*, 144 Wn.2d 654, 662-64, 30 P.3d 483 (2001); *City of Seattle v. McCready*, 123 Wn.2d 260, 280, 868 P.2d 134 (1994). But Hatchie is incorrect that the bail provision invalidated Schinnell's arrest warrant.

¶36 Hatchie relies entirely on *City of Yakima v. Mollett*, 115 Wn. App. 604, 63 P.3d 177 (2003). There, Division Three ruled that the pretrial release provisions of CrRLJ 3.2(a) do not allow a court to require a cash-only bail. *Mollett*, 115 Wn. App. at 609-10. Even if we assume that *Mollett* applies and that the cash-only bail provision of Schinnell's warrant was invalid, the bail provision is severable from the warrant's probable cause determination and its presence does not invalidate the court's otherwise proper warrant for Schinnell's arrest. A warrant is invalid if it is not issued by a neutral and detached magistrate,[9] if it is not based on probable cause,[10] or if the court lacks authority to issue it.[11] Such failings go to the constitutional heart of the warrant;

[8] We note that it is an open question as to whether Schinnell was in fact a resident of Hatchie's unit. "Residence as the term is commonly understood is the place where a person lives as either a temporary or permanent dwelling, a place to which one intends to return, as distinguished from a place of temporary sojourn or transient visit." *State v. Pickett*, 95 Wn. App. 475, 478, 975 P.2d 584 (1999); *see also Sheldon v. Fettig*, 129 Wn.2d 601, 611, 919 P.2d 1209 (1996) (an individual can maintain more than one "dwelling place[ ]" or "house of usual abode"). Here, Schinnell testified that for the two months before his arrest, he was unemployed, homeless, and staying and sleeping at Hatchie's home three nights per week. Schinnell would sleep in his truck the other nights except for once a week when he would stay with a woman.

[9] *Staats v. Brown*, 139 Wn.2d 757, 777, 991 P.2d 615 (2000).

[10] *State v. Nusbaum*, 126 Wn. App. 160, 166, 107 P.3d 768 (2005).

[11] *Bosteder v. City of Renton*, 155 Wn.2d 18, 32-33, 117 P.3d 316 (2005).

a type of bail provision does not. Moreover, Hatchie's reliance on *Mollett* is misplaced. The *Mollett* court merely held that the bail provision was unlawful; it did not hold that Mollett's arrest made pursuant to the warrant was unlawful. We reject Hatchie's claim that Schinnell's arrest warrant was invalid due to the cash-only bail provision.

¶37 We conclude that the deputies lawfully entered Hatchie's duplex unit to serve a misdemeanor arrest warrant on Schinnell, who they had probable cause to believe was residing there. As part of the lawful entry, the deputies saw in plain view evidence of a methamphetamine lab and subsequently obtained a valid search warrant to seize that lab. We, therefore, affirm the trial court's order denying Hatchie's motion to suppress.

ALLOCUTION

¶38 RCW 9.94A.500(1) requires that the defendant be given an opportunity to allocute, i.e., plead for mercy, before the court imposes a sentence. *In re Pers. Restraint of Echeverria*, 141 Wn.2d 323, 336, 339 n.54, 6 P.3d 573 (2000). Hatchie maintains that he is entitled to be resentenced before a different judge because the court announced its intended sentence before giving him a chance to allocute. We disagree.

¶39 Division Three has held that a defendant is automatically entitled to a new sentencing hearing when allocution comes after pronouncement of a sentence. *See State v. Crider*, 78 Wn. App. 849, 860-61, 899 P.2d 24 (1995). According to that court:

> [A]n opportunity to speak extended for the first time after sentence has been imposed is "a totally empty gesture." Even when the court stands ready and willing to alter the sentence when presented with new information (and we assume this to be the case here), from the defendant's perspective, the opportunity comes too late. The decision has been announced, and the defendant is arguing from a disadvantaged position.

*Crider*, 78 Wn. App. at 861. Division One agreed with *Crider* in *State v. Aguilar-Rivera*, 83 Wn. App. 199, 203, 920

P.2d 623 (1996). But more recently, Division One declined to follow *Aguilar-Rivera* in *State v. Gonzales*, 90 Wn. App. 852, 954 P.2d 360, *review denied*, 136 Wn.2d 1024 (1998). The *Gonzales* court concluded that harmless error analysis "should be available, albeit used infrequently," to determine whether resentencing is required when the defendant is not afforded an opportunity to allocute. 90 Wn. App. at 853-55 (error harmless because the defendant received a low-end sentence, he told the sentencing court to "get it over with," and he thanked the court for the sentence). *See generally State v. Zimmerman*, 130 Wn. App. 170, 176-78, 121 P.3d 1216 (2005) (discussing the "very limited class" of errors not subject to harmless error analysis).

¶40 We decline to follow *Crider*, *Aguilar-Rivera*, or *Gonzales*. We initially note the long standing rule that a court's oral opinion is no more than an oral expression of the court's informal opinion at the time rendered; it is " 'necessarily subject to further study and consideration, and may be altered, modified, or completely abandoned.' " *State v. Hescock*, 98 Wn. App. 600, 606, 989 P.2d 1251 (1999) (quoting *Ferree v. Doric Co.*, 62 Wn.2d 561, 567, 383 P.2d 900 (1963)); *accord State v. Head*, 136 Wn.2d 619, 622, 964 P.2d 1187 (1998). A court's oral ruling has no binding or final effect until it is reduced to writing. *State v. Mallory*, 69 Wn.2d 532, 533-34, 419 P.2d 324 (1966); *Hescock*, 98 Wn. App. at 605-06. The trial court's premature statement of its contemplated sentence is therefore not the imposition of a sentence. As such, Hatchie was provided a meaningful opportunity to address the court before sentence was imposed.

¶41 Furthermore, in *State v. Hughes*, 154 Wn.2d 118, 152-53, 110 P.3d 192 (2005), the Washington Supreme Court held that a defendant waives his statutory right to allocution if he does not request an opportunity to exercise that right. *See also State v. Canfield*, 154 Wn.2d 698, 707-08, 116 P.3d 391 (2005) (applying the same waiver rule to an offender's limited procedural due process right to allocute at a sentence revocation hearing; waiver found

where offender attempted to reargue the evidence but did not give "some indication of his wish to plead for mercy"). We agree with *Crider* that "[o]ffering a defendant the opportunity to address the court prior to passing sentence should be a rote exercise at every sentencing. It should be a mechanical act so routine as to require no thought." 78 Wn. App. at 861; *accord Echeverria*, 141 Wn.2d at 336-37. But if a defendant has no remedy when he is not offered an opportunity to allocute at any point during sentencing, he surely has no remedy when he is offered allocution, albeit after the court has orally indicated its intended sentence.

¶42 We also note that Hatchie never indicated that he wished to offer a statement in mitigation of his sentence. Hatchie and his attorney remained silent when the court stated that it was "ready to rule" and that it would impose a 55-month sentence "unless your client has something else to add or say . . . on his own behalf." VRPS (Mar. 12, 2004) at 19. It was the prosecutor who sought to ensure that Hatchie had an opportunity to allocute before the court issued its final ruling. Had the prosecutor simply remained quiet, Hatchie would have waived his right to allocute under *Hughes* and he would have received the orally announced 55-month sentence, rather than the 53-month sentence the court imposed after hearing from Hatchie. Hatchie is not entitled to resentencing.

¶43 Affirmed.

¶44 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BRIDGEWATER and HUNT, JJ., concur.

Review granted at 159 Wn.2d 1014 (2007).